STATE OF NEBRASKA, APPELLANT, V. MICHAEL ZEMUNSKI, APPELLEE.
STATE OF NEBRASKA, APPELLANT, V. MITCHELL WHITELEY, APPELLEE.

423 N.W.2d 443

Filed May 13, 1988.   Nos. 88-149, 88-150.

Glenn A. Clark, Phelps County Attorney, for appellant.

Patrick T. O'Brien of Bauer, Galter & O'Brien, for appellee Zemunski.

Nancy S. Freburg, Phelps County Public Defender, for appellee Whiteley.

CAPORALE, J.

In case No. 88-149 the State charged defendant-appellee, Michael Zemunski, with the felony of burglarizing the "Holdrege Coop" on March 20, 1987, in violation of Neb. Rev. Stat. § 28-507 (Reissue 1985). Defendant-appellee, Mitchell Whiteley, was charged with the same crime in case No. 88-150. The district court sustained a portion of the motion filed by each defendant to suppress the evidence obtained by the police. In these consolidated interlocutory appeals to a single judge of this court, taken pursuant to the provisions of Neb. Rev. Stat. § 29-824 (Reissue 1985), the State claims the district court erred in finding that the arrest of each defendant "was not based upon probable cause and was therefore unlawful requiring the suppression of all evidence seized from the motor vehicle." The decisions of the district court are affirmed.

## THE SETTING

On March 24, 1987, a police task force was formed by about 20 southeast Nebraska law enforcement agencies to investigate a series of seemingly related burglaries. Investigator Ronald Osborne of the Nebraska State Patrol participated in this task force, as did Lancaster County Sheriff's Det. Sgt. Robert Marker. According to Osborne, the general modus operandi entailed gaining entry to the burglarized premises by the use of a bar or a screwdriver to spread the doorjamb. When safes were involved, they were "peeled" from top left to bottom right. Most of the time the burglaries occurred late at night or early in the morning, and there was generally more than one burglary in a particular town or general area. Usually, only money was taken.

In the course of the task force investigation, Osborne concluded that 117 burglaries which had occurred in 17 Nebraska counties on 35 separate days between July 1, 1986, and April 1, 1987, fit this pattern. Vehicles in defendant Zemunski's possession had been seen in the vicinity of three of these burglaries. Osborne thus had come to suspect that defendant Zemunski and his friend, defendant Whiteley, were involved in all of the burglaries.

Osborne had become acquainted with defendant Zemunski in February of 1987 in connection with an investigation into an earlier attempted burglary. In the course of this prior investigation, Osborne kept Zemunski under surveillance on February 22, 23, 24, and 25, and on March 1, 2, 4, and 11, 1987. During this time, Osborne observed only that defendants attended the dograces at Council Bluffs, Iowa, together. However, Osborne had been told that defendant Zemunski had been arrested as the result of a Lancaster County burglary and was out on bond and that he was suspected of burglary by the Auburn Police Department and the Otoe County sheriff's office.

At about 2 a.m. on April 2, 1987, Fillmore County Sheriff's Deputy Jeff Brandl, on routine patrol in Grafton, noticed lights on at the town's grain elevator, indicating a possible illegal entry. Brandl notified his office by telephone that a burglary might be in progress at the grain elevator; his office in turn

notified sheriffs' offices in surrounding counties of the possible break-in. However, subsequent investigation disclosed that no entry or burglary had in fact occurred.

The Fillmore County sheriff's office informed Osborne at about 2:20 a.m. that a burglar alarm had been triggered in Grafton. Osborne then called the Lancaster County sheriff's office, arranged to meet Marker at the Pleasant Dale Interstate 80 interchange, and left his home at about 3 a.m. Acting in accordance with Osborne's requests, two additional State Patrol investigators traveled from Lincoln to Grafton on U.S. Highway 6 as Osborne and Marker drove on I-80 toward Grafton, these being the two main routes between Lincoln and Grafton. As noted in the suppression hearing below, "All of this was done in connection with the report that [Osborne] received from the Fillmore County Sheriff in regard to the alarm going off in Grafton."

As Osborne, Marker, and the other police officers traveled to Grafton, they watched for one of the vehicles in defendant Zemunski's possession, a silver Chevrolet station wagon, Nebraska license No. 2-A9185, registered to Micho Investments, an entity owned by defendant Zemunski's father. While still on I-80 looking for the silver Chevrolet, Osborne and Marker received word that no break-in had occurred in Grafton; Osborne testified that he recalled no other radio messages regarding possible burglaries before he and Marker later encountered the silver Chevrolet.

### THE STOP

At about 4:50 a.m., upon leaving I-80 at the U.S. Highway 81 interchange, Osborne and Marker observed the silver Chevrolet in the parking lot of a cafe at that location. Osborne and Marker parked nearby and watched the vehicle until "5:20 to 5:30." Shortly after stopping to watch the silver Chevrolet, at around 5 a.m., Osborne received a request "to call the . . . Aurora Police Department." Responding to this request, Osborne placed a phone call to the State Patrol dispatcher in Grand Island, later determined to be one Katherine Engle, from the lobby of the establishment where he and Marker were parked; Engle patched Osborne through to a police official in Aurora, and this official told Osborne about several burglaries

in Aurora. Osborne apparently was not in direct radio contact with Aurora.

According to Osborne, in this phone conversation he learned that a farmers' cooperative, a grocery store, and a lumberyard had been burglarized in Aurora, that a safe in the cooperative had been "peeled," and that money was missing from it. This conversation was hastily terminated when Marker saw the silver Chevrolet leave the cafe parking lot and pull onto the Interstate heading east. Osborne and Marker followed. According to Osborne, he had to vary the speed at which he drove from 40 to 70 miles per hour in order to keep up with the silver Chevrolet.

Osborne testified that he and Marker periodically received radio transmissions from Engle giving them additional information regarding the Aurora burglaries as they followed the suspect vehicle on I-80; however, Osborne admitted that this assertion is not supported by any of the communications records kept by the various police agencies that morning.

Engle noted in her personal log that a Hamilton County sheriff's deputy reported a grocery store and a lumberyard in Aurora had been burglarized. She also noted that Osborne was then in his vehicle near York, "watching a suspect vehicle . . . they had word there may possibly be a break-in at Grafton." Engle eventually contacted Osborne and patched him through to Aurora, but did not monitor the entire conversation between Osborne and the Aurora police. Sometime later, Engle was asked to pass on a description of some evidence from Aurora to Osborne; as she recalled at the suppression hearing below, Aurora police officials asked her to tell Osborne about "some foot prints on a bank bag." Engle identified the source of this information as a police officer in Aurora whose badge number was 4283. In the initial phase of the suppression hearing held on October 16, 1987, Engle testified that it was her understanding that Osborne already had "two suspects in custody at the Pleasant Dale interchange and was proceeding to the, I believe the police department in Lincoln," by the time she passed officer No. 4283's information to him. However, at the second phase of the suppression hearing held on January 21, 1988, Engle testified that she had relayed information to Osborne shortly before 6 a.m.; she initially testified that she could not

remember the nature of the information, but subsequently stated that she had relayed a description of a footprint on a bank bag to Osborne. Engle also testified that after Osborne received this information, "he immediately called Lincoln saying he was stopping the vehicle." In the course of Engle's testimony on January 21, the district court questioned her as follows:

[Court] Perhaps I don't recall your testimony correctly but I believe that at the prior hearing here that we had in this matter on October 16th, you testified that the conversation with footprints and bank bags that was reported by 4283, that that conversation was after the suspects had already been stopped. Do you remember testifying to that effect?

[Engle] Yes, sir.

[Court] Is your testimony today inconsistent with your prior testimony?

[Engle] I have since recalled two communications.

[Court] At the prior hearing on October 16th, 1987, you testified that there was only one radio conversation between you and Investigator Osborne?

[Engle] Yes, sir.

[Court] And now you're saying there were two such radio conversations?

[Engle] Yes, sir.

[Court] Did this just come to you between — when did this revelation come to you?

[Engle] We had a meeting over at the County Attorney's office in Aurora with all of us involved and I recalled talking to him, I don't recall specifically what I said but I remember what I thought at the time.

[Court] And how was your memory refreshed in this regard?

[Engle] Between all of us we were trying to get — recall between all of us when things happened.

[Court] Now you say "all of us". Who's all of us?

[Engle] There was the dispatcher from Aurora, Phil Wagner, Chief Gage, Osborne, Marker, and Lee Jones is all I can recall being there.

[Court] And this meeting took place when?

[Engle] It was in December.

Hamilton County sheriff's office records indicate that Osborne spoke to Aurora Police Chief William Gage sometime between 5:08 and 5:22 on the morning of April 2, 1987. Shortly after this call was completed, Engle relayed a question for Gage, apparently from Osborne: Had certain brands of cigarettes been taken in the Aurora burglaries? At 5:24 a.m., Engle asked if any footprints were noted at the scenes of the Aurora burglaries, and was told that "a tennis shoe print" had been observed. At 6:03 that morning, Engle called to ask Gage if any of the money taken in the Aurora burglaries had been bundled together with rubber bands, and to inform Aurora that Osborne had two suspects in custody. Later, Gage informed Engle that as far as they knew, no such bundles of money had been taken in the Aurora burglaries. Hamilton County sheriff's office records indicate and Jill Hunnicutt, the dispatcher on duty in that office during the early morning hours of April 2, 1987, recalled no conversation regarding a bank bag between 3:12 a.m. and the time at which Engle advised Aurora that suspects were in custody; further, no request for a description of the "tennis shoe" pattern was noted until 6:08 that morning. During the second phase of the suppression hearing, Gage testified that his only conversation with Osborne on the morning of April 2, 1987, had occurred by phone at 5:22 a.m. and that he did not mention a bank bag or footprints to Osborne during that conversation.

Aurora Police Officer Phillip Wagner testified that he had placed a call to Engle at about 6 a.m. on April 2, 1987, informing her that evidence observed at the scene of the cooperative burglary in Aurora included "tennis shoe prints left on some bank bags at the scene." Later, Engle called Wagner at the cooperative, and he described the footprints. Wagner also testified that he knew when Engle asked for a description of the footprints that Osborne already had suspects in custody.

In the first phase of the suppression hearing, Osborne maintained that he had received detailed information from Aurora before he stopped the silver Chevrolet, although police agency records indicate that information regarding the tennis

shoe pattern observed at the scene of the Aurora burglaries had been passed on to Osborne and Marker after they had stopped the vehicle. In the second phase of the suppression hearing, Osborne maintained that he had received two descriptions of the footprint patterns, one before he stopped the vehicle and the other which he requested for clarification after he had stopped the vehicle.

The description of the tennis shoe patterns observed in connection with the Aurora burglaries was thought to be significant, in that "these were the same shoe designs that had been reported in several of the burglaries" the police task force was investigating. However, Osborne testified that he did not examine the soles of the shoes the defendants were then wearing until after he had placed them under arrest.

Osborne and Marker followed the silver Chevrolet east on I-80 to the Pleasant Dale interchange, about 1 mile west of the Lancaster County border, where the vehicle left the Interstate and proceeded north. Osborne and Marker then activated their lights, and at about 6 a.m. the silver Chevrolet was stopped in the parking area of a Bingo service station located in Seward County, not in Lancaster County.

## THE ARREST

Osborne and Marker approached the silver Chevrolet on foot and found the defendants inside. At the initial phase of the suppression hearing, Osborne testified:

> After we had stopped the vehicle, I went up to the drivers side, Detective Marker went up to the passengers side. I determined on the way up that there were two people in the vehicle. When I got to the drivers side I asked the driver of the vehicle for some identification. The driver was Mitchell Whiteley who produced a drivers license. Detective Marker was on the other side of the vehicle. I heard him when we first got there ask the passenger for some identification. I saw the passenger — I didn't hear what the passenger replied but I saw some motions and movements that the passenger was doing.
>
> [Q.] And what motion was that?
>
> [Osborne] He was putting his right hand inside the left part of his coat, under his coat.

[Q.] What did you do at that point in time?

[Osborne] I backed up from the vehicle, backed away from the vehicle.

[Q.] Did you see Investigator Marker?

[Osborne] Yes.

[Q.] What did he do?

[Osborne] He also backed up on the other side.

[Q.] What happened then?

[Osborne] The passenger's hand came out and at that time we got next to the vehicle again. I observed the passenger's hand go in his coat again, I backed up again, Deputy Marker backed up and at that point we asked the two occupants of the vehicle to get out of the vehicle.

[Q.] Could you see inside the vehicle at that time?

[Osborne] Yes.

[Q.] Prior to the time that they got out of the vehicle?

[Osborne] I could see, yes.

[Q.] What did you see?

[Osborne] I saw Mitchell Whiteley in the drivers portion. I saw Michael Zemunski on the passenger side. On the floorboard of the passenger side I saw a screwdriver and what looked like the handle of either — it was a handle about this long (indicating) and then from there it looked like a chisel. Straight down under Mitchell Whiteley's feet or between his feet sticking out approximately an inch and a half from under the drivers seat was what appeared to be part of a money bag.

. . . .

[Q.] And at that time did you arrest them?

[Osborne] We shook them down. After shake down they were arrested, yes.

[Q.] When you shook them down what if anything did you find upon their persons?

[Osborne] A large amount of money.

. . . .

[Q.] What are you talking about a large amount of money?

[Osborne] Over $600.

In an earlier preliminary hearing in Aurora, Hamilton

County, Osborne had testified that he had seen only a large screwdriver in the vehicle. During the second phase of the suppression hearing, Osborne explained the inconsistency thus:

> At the time that I testified and at the time of the stop, I did see a handle but I did not know what the handle — I didn't know what was on the other end of that handle. All I could see was the handle, a screw driver and the bank bag. After the vehicle was searched, I then knew what the handle went to and that was a chisel.

Osborne and Marker then arrested Zemunski and Whiteley for possession of a burglary tool.

## THE SEARCHES

After the defendants exited the vehicle, Marker subjected defendant Zemunski to a "pat down" search. At the initial phase of the suppression hearing, Marker testified:

[Q.] Why did you ask the defendant to get out of the vehicle?

[Marker] Because he was reaching inside his jacket. I don't know what he was reaching for.

[Q.] Did you pat him down once he was outside?

[Marker] Yes, I did.

[Q.] Did you retrieve anything from him at that time?

[Marker] Yes, I did.

[Q.] What did you retrieve?

[Marker] There was a large folded over wad of money and I believe there was $690.

[Q.] How did you find that $690?

[Marker] By reaching in once I had patted him down I felt the bulge under his left side of his jacket and I reached in and took out the money.

[Q.] Did you have any idea what that was when you felt it?

[Marker] No.

[Q.] What did you think it was?

[Marker] I didn't know what it was.

A private citizen saw the defendants being stopped and arrested as she was starting her day's work at the Bingo service station at about 6 on the morning of April 2, 1987. The citizen testified that she is not acquainted with either defendant and

that she saw two officers walk up to the silver Chevrolet and exchange a few words, after which they "got the fellows out and had them turn around, frisked them, handcuffed them," and put them in an automobile. Then another automobile pulled up, at which time the now four officers got the defendants "out of the first car and repeated the performance and put them into the second" automobile. The officers then went to the silver Chevrolet, opened all four of its doors, and searched it, spending about a half hour in the process. The search included looking under the seats, and she saw them take several plastic bags out of the vehicle, but she did not know what was in the bags.

Marker, however, testified that he did not search the vehicle at the Bingo service station. Osborne also denied having searched the vehicle at the service station. The parties have further stipulated that if Officers Al Cherry and Larry Ball of the Lancaster County sheriff's office were to testify, they too would deny having searched the vehicle at the service station.

In any event, at Osborne's direction a tow truck was called from Lincoln, and the silver Chevrolet was towed to Lincoln. Osborne subsequently applied to the county court for Lancaster County for a warrant to search the vehicle, as well as the residences of defendants Zemunski and Whiteley. Osborne's affidavit in support of this application recited facts including descriptions of burglaries which occurred in Nebraska City on March 15, 1987, Seward on March 23, 1987, Fairbury on March 27 and 28, 1987, and Aurora on April 2, 1987, tending to show similarities in method and linking these burglaries to one another; and evidence, apparently gathered independently of the events of April 2, 1987, recited herein, to the effect that defendant Whiteley was seen at the location of one of the Fairbury burglaries "during the early morning hours of March 28, 1987." The county court was not told the vehicle had been first stopped in Seward County, and it issued a warrant authorizing searches of the vehicle and both residences.

### THE SUPPRESSION ORDERS

So far as is relevant to these appeals, the district court found in each case that while the stop of the defendant at the Bingo service station in Seward County was based upon articulable

facts supporting a reasonable suspicion and was therefore valid, the subsequent arrest of the defendant was not based on probable cause and was therefore unlawful. As a consequence, the district court suppressed all the evidence obtained from the person of the subject defendant as a result of the arrest. (While the same order was entered in each case, so far as the record reveals, the only item of evidence obtained from the search of the defendants was the $690 found on defendant Zemunski.) The district court also found that the searches made of the vehicle, both before and after the search warrant was obtained, were unlawful and thus suppressed all evidence obtained from those searches.

## ANALYSIS
### Scope of Review

The trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings are clearly erroneous. *State v. Gibson, ante* p. 455, 422 N.W.2d 570 (1988); *State v. Blakely,* 227 Neb. 816, 420 N.W.2d 300 (1988). Moreover, it must be recognized that the trial court has observed the witnesses testifying regarding such a motion. *State v. Blakely, supra*; *State v. Lee,* 227 Neb. 277, 417 N.W.2d 26 (1987). Thus, the trial court, as the trier of fact, is the sole judge of the credibility of witnesses and the weight to be given to their testimony and other evidence; it is not the function of a reviewing judge to reweigh the evidence or resolve conflicts in the evidence. See *State v. Blakely, supra.*

### Arrest Finding

Neb. Rev. Stat. § 29-404.02 (Reissue 1985) provides, among other things, that a peace officer may arrest a person without a warrant if the officer has reasonable cause to believe that such person has committed a felony. The lawfulness of a warrantless arrest must be based on probable cause, which exists where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed; if the facts available to the officer at the time of arrest would warrant a person of reasonable caution in the belief that such action was appropriate, then probable cause exists. *State v. Moore,* 226

Neb. 347, 411 N.W.2d 345 (1987); *State v. Jones*, 208 Neb. 641, 305 N.W.2d 355 (1981).

Regarding the "stop and frisk" exception to the usual requirement of a warrant, this court noted in *State v. DeJesus*, 216 Neb. 907, 915, 347 N.W.2d 111, 116 (1984):

> This particular exception of a warrantless search and seizure was adopted by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). The Court in that case held that a police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion.
>
> As stated in *Terry, supra* at 29: "The sole justification of the search in the present situation is the protection of the police officer and others nearby, and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."
>
> The standard is whether a reasonably prudent man under the circumstances would be warranted in the belief that his safety or that of others was in danger, and each case will have to be decided on its own facts.

Under *DeJesus*, the standard to be applied is clearly one of probable cause: Under the circumstances, did the officer have probable cause to believe that his safety or that of others was in danger? It has long been the rule in Nebraska, as this court stated in *State v. Aden*, 196 Neb. 149, 152, 241 N.W.2d 669, 671 (1976), that

> [i]t is not only the personal knowledge of the officer who makes the search and seizure which may be used to test probable cause, but added thereto may be the collective knowledge of the law enforcement agency for which the officer acts. However, in that case there must have been some communication of knowledge to or direction to act from the department or officer having that knowledge to the officer making the search and seizure.

(Citations omitted.)

In this case the record is devoid of any fact, discovered by Osborne and Marker or communicated to them by any other

officer, reasonably raising an inference that either defendant Zemunski or defendant Whiteley might have been armed at the time of the stop. Osborne, who had recently maintained surveillance on defendant Zemunski for almost 2 weeks, reported no indications of weapons possession; there is no evidence that any of the hundred or so burglaries in which Osborne suspected the defendants were involved had been accomplished through the use or threat of force against another person; defendant Zemunski's act of reaching into the inner pocket of his jacket is more reasonably understood to be an effort to comply with the officers' request for identification than a gesture of threat. As the Supreme Court observed in *Terry v. Ohio*, 392 U.S. 1, 29, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968),

> We need not develop at length in this case . . . the limitations which the Fourth Amendment places upon a protective seizure and search for weapons. . . . Suffice it to note that such a search, unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime.

(Citations omitted.)

On these facts we are unable to conclude that the district court was clearly in error in determining that the officers' search of the defendants' persons was improper, and, therefore, the evidence seized from defendant Zemunski must be suppressed.

### Search Findings

The next issue relates to the searches of the silver Chevrolet. The requirements which must be satisfied to uphold a warrantless search of and seizure from an automobile under the plain view doctrine are that the police officer must lawfully make the "initial intrusion" or otherwise properly be in a position from which he can view a particular area, that the officer must discover the incriminating evidence "inadvertently," and that it must be "immediately apparent" to the officer that the items observed may be evidence of a crime, contraband, or otherwise subject to seizure. *State v. Hansen*, 221 Neb. 103, 375 N.W.2d 605 (1985).

As noted earlier, the defendants were originally arrested for the felony of possessing a burglary tool. Neb. Rev. Stat. § 28-508 (Reissue 1985) provides:

> (1) A person commits the offense of possession of burglar's tools if:
>
> (a) He knowingly possesses any explosive, tool, instrument, or other article adapted, designed, or commonly used for committing or facilitating the commission of an offense involving forcible entry into premises or theft by a physical taking; and
>
> (b) He intends to use the explosive, tool, instrument, or article, or knows some person intends ultimately to use it, in the commission of an offense of the nature described in subdivision (1)(a) of this section.
>
> (2) Possession of burglar's tools is a Class IV felony.

In order to validate the seizure of items at that time and the subsequent arrest of the defendants, therefore, it is necessary for Osborne and Marker to have had probable cause to believe that defendants Zemunski and Whiteley possessed an item described in § 28-508 and that they did so with the intent required by that statute.

In considering this point, *Carpenter v. Sigler*, 419 F.2d 169 (8th Cir. 1969), a federal habeas corpus action following conviction in the courts of this state, see *State v. Carpenter*, 181 Neb. 639, 150 N.W.2d 129 (1967), *cert. denied* 392 U.S. 944, 88 S. Ct. 2288, 20 L. Ed. 2d 1406 (1968), is instructive. Therein, the police officers of a town where there had been a series of burglaries noticed an automobile cruise slowly around the business district during the early morning hours. The officers stopped the vehicle and noted a set of pry bars under the seat rather than in a toolbox. This court held that under those circumstances, probable cause existed to arrest the occupants for possession of burglar's tools. Notwithstanding the fact that Carpenter's arrest was triggered by a set of pry bars in plain view, not the mere and ordinary screwdriver found in this case, the U.S. Court of Appeals for the Eighth Circuit felt constrained to point out:

> The probable cause was supplied by the hour of the encounter [approximately 3:30 a.m.], the absence of

> explanation of why the tools were in the petitioner's possession, the location of the tools in the front of the auto under the seat rather than in a tool box in a more conventional place, and the series of burglaries which had taken place in Blair [where the defendants were arrested] prior to the morning in question.

419 F.2d at 172. In this case defendants Zemunski and Whiteley were arrested, not while cruising, presumably "casing" a target business, but while driving down a public highway, and not in the vicinity of the Aurora burglaries but many miles away. On the basis of this record it cannot be said that possession of an ordinary screwdriver, even if kept under the automobile seat, is such a fact as would warrant a person of reasonable caution to believe that the offense of possession of burglar's tools had been committed. *State v. Moore*, 226 Neb. 347, 411 N.W.2d 345 (1987); *State v. Jones*, 208 Neb. 641, 305 N.W.2d 355 (1981). Thus, the district court was not clearly in error in determining that what Osborne then saw was not such an item as to make it "immediately apparent" to the officers that the items they observed were evidence of a crime, contraband, or otherwise subject to seizure.

Moreover, during an investigatory stop, officers may search a suspect's vehicle in order to secure their safety or the safety of another if they have a reasonable belief, based on articulable facts, that they or other persons are in danger. *State v. Gross*, 225 Neb. 798, 408 N.W.2d 297 (1987). The search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the officer possesses a reasonable belief, based on specific and articulable facts, which reasonably warrants the officer to believe the suspect may gain immediate control of weapons. *State v. Pierce and Wells*, 215 Neb. 512, 340 N.W.2d 122 (1983). Insofar as, by all reports, defendants Zemunski and Whiteley were in handcuffs by the time Osborne and Marker turned their attention to the vehicle, it cannot be said the requirements of *State v. Gross, supra*, and *State v. Pierce and Wells, supra*, were met.

It therefore cannot be concluded that the district court was clearly in error in determining that there was no probable cause

for Osborne and Marker to seize any item from the vehicle without a warrant. It follows that Osborne was without authority to seize the vehicle itself; his act of ordering the vehicle towed from Seward County to Lancaster County was therefore unlawful, *Morfeld v. Bernstrauch*, 216 Neb. 234, 343 N.W.2d 880 (1984), and the district court was not clearly in error so to find.

The remaining issue concerns the search of the silver Chevrolet made under color of warrant. Neb. Rev. Stat. § 29-812 (Cum. Supp. 1986) provides in relevant part:

> A search warrant authorized by sections 29-812 to 29-821 may be issued by any district court judge or Supreme Court Judge of the State of Nebraska for execution anywhere within the State of Nebraska. A similar search warrant authorized by sections 29-812 to 29-821 may be issued by any judge of the county court within his or her district . . . within the county wherein the property sought is located.

Osborne requested and received the search warrant at issue from the county court for Lancaster County; Lancaster County is located in judicial district No. 3, while Seward County is located in judicial district No. 5. Neb. Rev. Stat. § 5-105 (Cum. Supp. 1986). Thus, this is not a situation such as was presented in *State v. Kleinberg, ante* p. 128, 421 N.W.2d 450 (1988), where officers in good faith executed a warrant containing a ministerial error; Osborne was simply without authority to order the vehicle towed to Lancaster County. It therefore cannot be said that the district court was clearly wrong in finding that the search of the vehicle in Lancaster County under color of the Lancaster County court warrant was improper, and thus ruling that evidence seized pursuant to that search was inadmissible.

## DECISION

Accordingly, the decisions of the district court must be affirmed.

AFFIRMED.