STATE OF NEBRASKA, APPELLEE, v. LANNY K. HICKS, APPELLANT.
488 N.W.2d 359

Filed August 28, 1992.   No. S-91-660.

Thomas M. Kenney, Douglas County Public Defender, and Patrick J. Boylan for appellant.

Don Stenberg, Attorney General, and J. Kirk Brown for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

This is a criminal case in which the State charged the defendant-appellant, Lanny K. Hicks, with being a felon in possession of a firearm, in violation of Neb. Rev. Stat. § 28-1206(1) (Reissue 1989). The defendant pled not guilty and filed motions to suppress physical evidence and statements made to the police. The trial court overruled the motions, and thereafter a jury in the Douglas County District Court found the defendant guilty of the offense charged. The trial court sentenced the defendant to prison for not less than 17 nor more than 34 months, with credit for 69 days' time served. This appeal followed.

## FACTUAL BACKGROUND

On October 28, 1990, Officers Mark Lang and Dennis Clark of the Omaha Police Division were conducting surveillance in an area of Omaha, Nebraska, experiencing a high incidence of

liquor violations and drug trafficking. From their position in a large, marked Winnebago vehicle parked at the corner of 24th and Lake Streets, the officers observed a group of black males gathered approximately a block and a half away. The group was standing near a liquor store located on the west side of 24th Street, just to the south of an alley which divides the block between Grant and Erskine Streets. Some of the men were holding liquor bottles, in violation of a city ordinance prohibiting drinking alcohol in public.

Shortly after 4 p.m., Lang and Clark contacted fellow officers John Francavilla and Mike Stewart, who were riding together in a marked police cruiser, and requested that they drive by the group of men under surveillance. The officers suspected that some of the parties might "drop or dump" alcohol or narcotics and generally just wanted to "see if we could get a reaction out of them."

Francavilla and Stewart responded by driving their cruiser eastbound through the aforementioned alley toward 24th Street. As the cruiser emerged from the alley, Francavilla and Stewart heard somebody yell, "[P]olice." Lang testified that from his position in the Winnebago, he could not hear any yelling, but saw what looked like some people shouting a warning. At that point the group began to disperse.

While Lang concentrated on the group of men near the liquor store, Clark noticed a white male wearing a dark jacket close the door of a brown station wagon and walk south on 24th Street toward the area under surveillance. Clark testified that as the cruiser emerged from the alley, he saw a black man turn and yell something to the white man, who then turned and ran up the street and around the block. Clark told Lang to instruct Francavilla and Stewart to back up and "check the party" because "there was something suspicious" about the way he "[a]ll of a sudden . . . bolted."

When Francavilla and Stewart backed down the alley as instructed, they saw a white man in a brown leather jacket walking toward them. The officers exited their cruiser and approached the man, asking him "what he was doing, what was going on." Stewart testified that when the man said, "Nothing, I ain't doing nothing," he asked the man why he was running.

At that point the man said, "I got a warrant."

After the officers identified the man as Hicks, they ran a check and discovered that there were in fact three outstanding warrants for Hicks' arrest. The officers arrested Hicks, and Francavilla patted him down, discovering, among other things, a clip to a .22-caliber semiautomatic pistol and a number of bullets.

Reasoning from the defendant's possession of the clip that he may have discarded or hidden a weapon nearby, Stewart searched the area. When Lang informed him by radio of the brown station wagon, Stewart approached the vehicle and ran a check on the license plates. After discovering that the car was registered to Hicks, he looked in the passenger-side window and saw the handle of a gun protruding from between the driver's seat and the front passenger seat. Stewart opened the unlocked door, seized the weapon, and returned to the cruiser.

As both officers and Hicks sat in the cruiser, Stewart and Francavilla engaged in a discussion regarding the weapon and whether it matched the clip found on the defendant. At that point Hicks stated, "[Y]ou can't charge me with that gun. It wasn't on me. You found it in my car. I will be able to get these charges dropped." Both Francavilla and Stewart testified that they did not ask Hicks any questions or solicit the statement in any way, but that Hicks just blurted it out.

At trial, Hicks testified that he loaned his car to a friend, Barbara Hoffman, at approximately 12:30 p.m. on October 28, 1990. He further testified that Hoffman returned later that afternoon and told him the car had broken down. He stated that he called another friend, who drove him to 24th and Erskine Streets at about 3:45 p.m. Hicks testified that after he unsuccessfully attempted to start the car, he was walking back to his friend's vehicle when a police cruiser approached, and its occupants jumped out and asked him for identification. Hicks denied that he was running at any point prior to this encounter and testified that he did not know there was a weapon in the front seat of his car. Hoffman largely corroborated Hicks' story, testifying that she purchased the weapon that afternoon and left it in the car when the car broke down at 24th and Erskine Streets.

## ASSIGNMENTS OF ERROR

On appeal, Hicks argues that the trial court "erred in overruling the Defendant's motion to suppress the fruits of the stop and subsequent arrest of the Defendant on October 28, 1990. Statements made by the Defendant to Omaha police officers should have been suppressed and ruled inadmissible at the Defendant's trial."

## LEGALITY OF THE STOP

A trial court's ruling on a motion to suppress is to be upheld on appeal unless its findings are clearly erroneous. *State v. Patterson*, 237 Neb. 198, 465 N.W.2d 743 (1991). In determining whether a trial court's findings on a motion to suppress are clearly erroneous, this court takes into consideration that the trial court observed the testimony of the witnesses. *Id.*

We first note that the State does not contest the assumption implicit in Hicks' argument that the officers "seized" him prior to his statement that there was a warrant out for his arrest. See, *U.S. v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980) (a person is seized within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would believe he is not free to leave); *Michigan v. Chesternut*, 486 U.S. 567, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988) (adopting *Mendenhall* test); *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991) (every encounter between a police officer and an individual in a public place is not necessarily a seizure of the individual). We therefore proceed upon the premise that a seizure occurred when the officers exited their cruiser, approached Hicks, and began asking him questions.

"The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975). In *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), the U.S. Supreme Court held that the public's interest in effective law enforcement makes it reasonable to detain and question individuals under certain circumstances in which

probable cause to arrest is lacking. However, in order to protect "the individual's right to personal security free from arbitrary interference by law officers," *Brignoni-Ponce*, 422 U.S. at 878, the *Terry* court held that such limited investigatory stops are permissible only upon a reasonable suspicion based upon specific and articulable facts that the person is, was, or is about to be engaged in criminal activity. The same standard is applied in determining the propriety of an investigatory stop under Neb. Const. art. I, § 7. *State v. Patterson, supra*; *State v. Caples*, 236 Neb. 563, 462 N.W.2d 428 (1990).

In this case, Officer Stewart testified at the suppression hearing that the decision to question Hicks was based upon information from the other officers that they saw Hicks flee upon approach of the cruiser. The fact that Stewart and Francavilla did not personally witness Hicks' flight is immaterial. See *State v. Zemunski and Whiteley*, 228 Neb. 536, 423 N.W.2d 443 (1988) (collective knowledge of the law enforcement agency for which an officer acts may provide the basis for a search and seizure, but some communication of that knowledge to the officer conducting the search and seizure is required). Thus, the sole issue presented by this appeal is whether an individual's flight upon the approach of a police vehicle patrolling a high-crime area is sufficient to justify an investigative stop of the person. The trial court held that such flight is alone sufficient to create a reasonable suspicion of involvement in criminal conduct. We disagree and therefore reverse.

A majority of jurisdictions addressing the issue hold that flight alone is insufficient to justify a *Terry* stop. See, e.g., *Dimascio v. Municipality of Anchorage*, 813 P.2d 696 (Alaska App. 1991); *State v. Talbot*, 792 P.2d 489 (Utah App. 1990) (collecting cases); *People v Shabaz*, 424 Mich. 42, 378 N.W.2d 451 (1985); *People v. Aldridge*, 35 Cal. 3d 473, 674 P.2d 240, 198 Cal. Rptr. 538 (1984); *People v. Thomas*, 660 P.2d 1272 (Colo. 1983); *Watkins v. State*, 288 Md. 597, 420 A.2d 270 (1980) (collecting cases). Instead, courts require proof of some independently suspicious circumstance to corroborate the inference of a guilty conscience associated with flight at the sight of the police. *Aldridge, supra*; *Thomas, supra*; *Watkins,*

*supra.*

These courts recognize that allowing flight alone to justify an investigative stop would undercut the very values *Terry* sought to safeguard. *Terry* is based in part upon the proposition that the right to freedom from arbitrary governmental intrusion is as valuable on the street as it is in the home. Thus, while a police officer does not violate the Fourth Amendment by approaching an individual in a public place and asking if the person will answer some questions, neither is the person under any obligation to answer. *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). The person may decline to listen to the questions at all and simply go on his or her way. *Id*. If the option to "move on" is chosen, the person "may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds." 460 U.S. at 498.

In other words, "A citizen has as much prerogative to avoid the police as he does to avoid any other person, and his efforts to do so, without more, may not justify his detention." *Smith v. U.S.*, 558 A.2d 312, 316 (D.C. App. 1989). Flight upon approach of a police officer may simply reflect the exercise—"at top speed"—of the person's constitutional right to " 'move on.' " *Shabaz*, 424 Mich. at 63, 378 N.W.2d at 460. *Terry* and *Royer* stand for the proposition that exercise of this constitutional right may not itself provide the basis for more intrusive police activity.

Nor is an intense desire to avoid contact with the police necessarily indicative of a guilty conscience. Fear or dislike of authority, distaste for police officers based upon past experience, exaggerated fears of police brutality or harassment, and fear of unjust arrest are all legitimate motivations for avoiding the police. *In re D.J.*, 532 A.2d 138 (D.C. App. 1987).

The Colorado Supreme Court emphasized this point in *Thomas, supra*, in which four police officers were on routine patrol in an unmarked police vehicle when they saw a man they recognized as "Cherokee" Thomas standing in the parking lot of a fast-food restaurant. Thomas apparently recognized the officers too, because upon making eye contact with them, he thrust his hand in his pocket and began to run. The officers gave

chase, following him into a nearby building, where one officer saw him throw something into a water pitcher. The officers subsequently caught him and retrieved the objects, which turned out to be six balloons containing cocaine. The trial court granted Thomas' motion to suppress the cocaine, and the state appealed.

The Colorado Supreme Court affirmed the trial court's decision, rejecting the prosecution's argument that Thomas' "furtive gesture" of placing his hand in his pocket and running at the sight of the officers provided an articulable suspicion sufficient to justify the chase. The court reasoned:

> The problem with the so-called "furtive gesture" as the basis for a stop is its inherent ambiguity. From the viewpoint of the observing police officer, an innocent move may often be mistaken for a guilty reaction. From the perspective of the person observed, the "furtive gesture" might be impelled by a variety of motives, from an unsettling feeling of being watched to an avoidance of what might be perceived as a form of harassment.

*Thomas*, 660 P.2d at 1275.

A prime concern underlying the *Terry* decision is protecting the right of law-abiding citizens to eschew interactions with the police. Authorizing the police to chase down and question all those who take flight upon their approach would undercut this important right and upset the balance struck in *Terry* between the individual's right to personal security and the public's interest in prevention of crime. We therefore join those jurisdictions holding that flight from a police officer is sufficient to justify an investigatory stop only when coupled with specific knowledge connecting the person to involvement in criminal conduct. See, e.g., *U.S. v. Morgan*, 759 F. Supp. 896 (D.D.C. 1991) (flight from scene of recently reported burglary upon approach of police enough to warrant investigatory stop); *State v. Wylie*, 10 Conn. App. 683, 525 A.2d 528 (1987) (flight by person whom officer had been informed was carrying a weapon enough to create articulable suspicion); *Clinkscale v. State*, 158 Ga. App. 597, 281 S.E.2d 341 (1981) (flight by person identified as possible suspect in recent burglary enough); *Dimascio, supra* (act of breaking off meeting with

another man and fleeing upon sight of police, then returning and resuming conversation, only to flee again when police returned, combined with lateness of the hour and reputation of vicinity as a high-crime area enough); *People v. Collom*, 268 Cal. App. 2d 242, 73 Cal. Rptr. 707 (1968) (officer justified in arresting a man whom he saw engage in a furtive exchange of some object for money and then run upon sight of the officer). We next must determine whether any such corroborating circumstances exist in this case.

This case is very similar to *People v Mamon*, 173 Mich. App. 429, 435 N.W.2d 12 (1988), *rev'd on other grounds* 435 Mich. 1, 457 N.W.2d 623 (1990). There, two police officers were driving on routine patrol in a marked squad car through an area known for narcotics activity. As the officers approached a man standing on a corner near a public phone, the man took off running. The officers left their vehicle and pursued the man on foot, noticing that he removed a burgundy-colored case from his pocket and dropped it during the chase. The officers ultimately caught the man and retrieved the case, which contained cocaine. The trial court quashed an information charging the man with possession of a controlled substance, and the state appealed.

A Michigan intermediate court of appeals affirmed the trial court's decision. The court began by addressing the circumstances existing before the man began to run. Though the incident occurred in a high-crime neighborhood, the court determined that a person's presence in such an area cannot, by itself, provide the basis for an investigatory stop. In so doing, the court noted that the officers were not responding to a particular complaint of wrongdoing in the area and that the man made no furtive gestures prior to seeing the officers. Concluding that the officers lacked an articulable basis for stopping the man as he stood on the corner, the court turned to the significance of his flight upon their approach. Noting the ambiguous nature of flight as an indicator of guilt, the court held that the act of running at the sight of police patrolling a high-crime area did not provide the particularized grounds necessary to support a reasonable suspicion that criminal activity was afoot.

Here, as in *Mamon*, Officers Francavilla and Stewart were on routine patrol when the incident occurred. They were not responding to any call or report of suspicious activity in the area. Though Officer Lang testified at trial that the portion of 24th Street involved is known for narcotics activity, we agree with the numerous decisions holding that a person's presence in such an area by itself does not warrant a suspicion that that person is involved in crime. *Brown v. Texas*, 443 U.S. 47, 99 S. Ct. 2637, 61 L. Ed. 2d 357 (1979); *In re D.J., supra* (thousands of people live and go about their legitimate business in neighborhoods designated as high-crime areas by the police); *Shabaz, supra*; *Aldridge, supra*.

It is also clear that Hicks gave no outward indication of involvement in illicit activity prior to the approach of the cruiser. He was not among the group of men huddled together and carrying liquor bottles. He was simply walking down the street when the cruiser emerged from the alley. As in *Mamon*, the officers lacked an articulable basis for suspecting Hicks of involvement in criminal activity prior to the point at which he turned and ran.

When asked at the suppression hearing why he and Francavilla stopped Hicks, Officer Stewart testified that "[w]e felt he was acting suspiciously in the fact that the other officers had advised us that it looked from their vantage point that he was trying to hide or allude [sic] us." In the absence of circumstances corroborating the conclusion that Hicks was involved in criminal activity, Officer Stewart's testimony reveals nothing more than a hunch. Though perhaps the hunch was correct in this case, if the police are allowed to stop and question citizens upon less than particular and specific facts creating an articulable suspicion of criminal behavior, " 'the risk of arbitrary and abusive police practices exceeds tolerable limits.' " *Thomas*, 660 P.2d at 1277, quoting *Brown v. Texas, supra*. Because Officer Stewart was not able to point to specific facts corroborating the inference of guilt gleaned from Hicks' flight, the investigatory stop in this case was constitutionally infirm.

## EFFECT OF THE UNCONSTITUTIONAL SEIZURE

Evidence obtained as the fruit of an unconstitutional search and seizure is inadmissible in a state prosecution. *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963); *State v. Tingle*, 239 Neb. 558, 477 N.W.2d 544 (1991). The clip and bullets found on Hicks, as well as the handgun found in his car and the statement he made to the officers, were all the direct result of the initial stop and therefore inadmissible at trial. However, a prerequisite to an appeal based upon error in the admission of evidence is a timely objection stating the grounds therefor unless the grounds are apparent from the context. *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992).

The first witness called by the State at Hicks' trial was Officer Lang. Lang testified, without objection, that Officer Stewart told him of finding a clip on Hicks and a handgun in his car. This testimony was objectionable, both as hearsay and based upon the unconstitutionality of the stop. Moreover, Hicks also made no objection as the State displayed the handgun to the jury and elicited Lang's testimony that it was the gun found by Francavilla and Stewart. A party who fails to make a timely objection to evidence waives the right on appeal to assert prejudicial error concerning the evidence received without objection. *State v. Cave*, 240 Neb. 783, 484 N.W.2d 458 (1992). Though the State waited until the testimony of Officer Francavilla to actually introduce the handgun into evidence, the "cat was out of the bag" long before then. Error cannot be predicated on the admission of testimony when testimony of the same nature was previously admitted without objection. *Breiner v. Olson*, 195 Neb. 120, 237 N.W.2d 118 (1975). Hicks waived his objection to evidence regarding his possession of the clip and handgun by failing to make a timely objection.

Hicks did promptly object to testimony regarding the statement he made while sitting in the cruiser. Hicks' defense was based upon the theory that Hoffman placed the gun in Hicks' car without his knowledge, after she borrowed the car earlier that afternoon. Hicks' statement to the officers that he did not care about the gun because it was in his car rather than on his person could be interpreted as an implicit admission of

ownership. The State attempted to cross-examine Hicks on this very basis. We cannot say the trial court's error in overruling Hicks' motion to suppress his statement to the police was harmless beyond a reasonable doubt. See *State v. Reynolds*, 240 Neb. 623, 483 N.W.2d 155 (1992). Accordingly, we reverse and remand for a new trial.

REVERSED AND REMANDED FOR A NEW TRIAL.