STATE OF NEBRASKA, APPELLEE, V. MICHAEL A. TWOHIG,
APPELLANT.

469 N.W.2d 344

Filed May 10, 1991.    No. 90-019.

Dorothy A. Walker, of Mowbray & Walker, P.C., for appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai for appellee.

HASTINGS, C.J., WHITE, CAPORALE, SHANAHAN, and GRANT, JJ., and COLWELL, D.J., Retired.

SHANAHAN, J.

Michael A. Twohig appeals from the judgment of the district court for Lancaster County, which affirmed Twohig's county court conviction for drunk driving, a violation of Neb. Rev. Stat. § 39-669.07 (Reissue 1988).

Before trial in county court, Twohig timely moved to

suppress his statements to a police officer and physical evidence obtained from Twohig, including results of a breath test for alcohol in Twohig's body. See Neb. Rev. Stat. §§ 29-115 (suppression of defendant's statement) and 29-822 (suppression of physical evidence) (Reissue 1989). After the court denied the suppression motion, Twohig's case proceeded to a bench trial on the charge that Twohig had driven a motor vehicle on November 13, 1988, while he was "under the influence of alcoholic liquor . . . or when [Twohig had] a concentration of .10 of one gram or more by weight of alcohol per 210 liters of his breath . . . ." See § 39-669.07.

## BACKGROUND FOR CHARGE

*The Accident.*

Around 11:40 p.m. on November 13, 1988, while on cruiser patrol south of Lincoln, Deputy Kirk Price of the Lancaster County Sheriff's Department responded to a radio dispatch for assistance of an officer at an automobile accident near 91st Street and Pioneers Boulevard. At the accident scene, Deputy Price saw a 1975 Chevrolet Impala headed west in the north ditch along Pioneers Boulevard. As evidenced by damage on the Chevrolet's front end, the car had struck and sheared a wooden "power pole," which was "hanging . . . from [its] wires." Also at the accident site was a driver or lineman from Lincoln Electric System, since the collision had caused a "power outage." From Lincoln Electric, Price found out that "there had been a person walking in the area." Shortly thereafter, David F. Brumagen, another deputy sheriff, arrived on the scene. As the result of a registration check, Price learned that the Chevrolet was registered to a "Michael Twohig" of Lincoln. However, Price obtained no physical description for the Chevrolet's owner, Twohig.

*Price's Encounter with Twohig.*

Price left the accident site and set out to locate anyone "who may have been involved in that accident." After driving west on Pioneers, Price turned north from Pioneers on 70th Street and traveled a little over a quarter mile in an area which was generally "bushy and hilly . . . not a smooth terrain [with] some fences." The time was 11:55 p.m. when Price, still northbound

in his cruiser, noticed a man "limping" northward along 70th Street at a point which was about a quarter mile north of Pioneers Boulevard and "just short of two miles" from the automobile accident which Price had just left. As Price's northbound cruiser approached, the man, now facing south, "was standing right at the edge of the roadway . . . at the edge of the road, right at the curb, off the roadway but right at the curb." Price stopped his cruiser, got out, and immediately engaged in a conversation with the man. During this conversation, Price asked the man "who he was" and "what he was doing and where he was coming from." Price found out that the man was "Twohig," who, in response to Price's inquiries, replied that he "had been walking . . . because he had left his vehicle at a friend's house [since] he was too drunk to drive." Next, Price "[f]risked him down for weapons just for safety purposes. And at that time [Price] also smelled a strong odor of alcohol about him." During this "patdown" search, Price "ended up finding keys on [Twohig's] person."

After finding the keys, Price placed Twohig in the cruiser and resumed the conversation, which was tape-recorded by Price and later transcribed. During this recorded conversation, Twohig admitted that he owned a "75 Chevy," which was at a friend's house about "8 miles from here," and that he was "too drunk to drive." In the course of the conversation, Twohig recited the alphabet, leaving out the letter e; counted backward from 100 to 85; and then asked: "[H]ow long we gotta do this?" However, Twohig generally denied driving any vehicle and being involved in any collision with a "power pole." According to Price, throughout the conversation in the cruiser, Twohig was not free to leave. There were no field sobriety tests beyond Twohig's recital of the alphabet and counting backward. Throughout this time, Price noticed that Twohig "had a strong alcohol odor. His face was kind of flushed, reddish." At the conclusion of the conversation with Twohig, Price arrested Twohig for "driving while intoxicated" because, according to Price, "based on the information and observations I — I made and gained [and] on the information that he provided with me, I felt there was probable cause to believe that he was the operator of the vehicle involved with the accident." As related

by Price, "I at some point obtained his driver's license" and informed Twohig: "I'm going to take you down for a breath test."

*At the Sheriff's Headquarters.*

In the cruiser Twohig and Price proceeded to the sheriff's headquarters, where Price read an "Implied Consent Advisement" form to Twohig concerning the breath alcohol test, which indicated ".18" for Twohig's breath. Price also administered the *Miranda* warning or admonition to Twohig. In further conversation with Price, Twohig admitted that he had started drinking around 8:30 p.m. on November 13 and had five or six drinks of rum that evening before meeting Price.

Price delivered the automobile keys, obtained from Twohig at 70th Street, to Deputy Brumagen, who used the keys to unlock and start the Chevrolet which had been involved in the power pole collision. During the course of making an inventory of the Chevrolet's contents, Brumagen discovered a "set of dentures" or "false teeth" on the driver's side of the Chevrolet, "directly underneath the steering wheel." Brumagen left the dentures in the Chevrolet, but later handed the car keys over to Twohig, who acknowledged that "those were his keys." On delivery of the Chevrolet's keys, Brumagen noticed that Twohig "didn't have any teeth in. . . . He didn't have any false teeth in . . . ."

## TWOHIG'S TRIAL

The prosecutor and Twohig's lawyer stipulated that the vehicle-power pole accident occurred at 11:10 p.m. on November 13, 1988; that the result of Twohig's breath alcohol test was ".180" of 1 gram of alcohol per 210 liters of Twohig's breath; and that the test was administered to Twohig in compliance with state health regulations pertaining to a breath alcohol test. In conjunction with the stipulation, Twohig's lawyer preserved the objection that the test and its results were obtained through an unconstitutional search and seizure regarding Twohig. When the transcription of the recorded Twohig-Price conversation in the cruiser was offered, Twohig objected and claimed that the "statement was taken in violation of [Twohig's] constitutional rights." Notwithstanding Twohig's

objections, the court considered the breath test results and received the transcription of the recorded conversation between Twohig and Price in the cruiser at 70th Street. The State's case consisted of evidence reflected in "BACKGROUND FOR CHARGE."

In his case in chief, Twohig testified that after driving his car to a party around 6 p.m. on November 13, he did not operate a motor vehicle that evening. At the party, Twohig determined that he "was too drunk to drive" and enlisted the services of "this guy at the party" to drive Twohig's car and take Twohig home. With Twohig as the passenger, the "other fellow" was driving Twohig's car when Twohig decided "to stop and have a drink" at a friend's home in a "trailer park in Pioneers Boulevard." When Twohig's friend did not "feel like doing any partying," Twohig, with his unidentified driver, continued to travel in Twohig's car down Pioneers Boulevard to the point where the Twohig vehicle struck the "light pole" near 91st and Pioneers. After the collision, the "other fellow" took off. Twohig started walking down Pioneers Boulevard and was walking along 70th Street when he saw "a set of headlights coming." Twohig "stopped and watched the headlights approach [him]." Eventually, Twohig discovered that the vehicle was driven by Deputy Price. Price asked where Twohig was going, to which Twohig responded "home." When Price asked, "Why are you walking?" Twohig said, "I gotta walk. I'm too drunk to drive."

At the conclusion of all evidence, the court found that Twohig was "guilty as charged" and later sentenced Twohig for drunk driving.

## ASSIGNMENTS OF ERROR

Twohig's seven assignments of error may be distilled into the following: (1) "[T]he initial stop of [Twohig] violated [his] Fourth and Fourteenth Amendment rights and the Terry Doctrine"; (2) Twohig's arrest was "without probable cause"; (3) the court erred by (a) receiving Deputy Price's testimony "about the keys seized from Twohig in violation of his Fourth and Fourteenth Amendment rights" and (b) receiving into evidence the "custodial interrogation of Twohig" in violation of

Twohig's constitutional rights; and (4) the evidence is insufficient to sustain Twohig's conviction for drunk driving.

## THE CONSTITUTIONALITY OF TWOHIG'S "STOP" AND ARREST

*The Initial Encounter with Twohig.*

Twohig and the State argue back and forth on whether an articulable suspicion of criminal activity existed for a "*Terry* stop" when Price encountered Twohig on 70th Street. Neither Twohig nor the State addresses the primary and basic question: Was the initial encounter between Twohig and Price a "stop" within the purview of *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), in which the U.S. Supreme Court stated:

> It is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime— "arrests" in traditional terminology. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person.

392 U.S. at 16.

The Court continued in *Terry*:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him.

392 U.S. at 30.

However, in *Terry* the Court also noted:

> We thus decide nothing today concerning the

constitutional propriety of an investigative "seizure" upon less than probable cause for purposes of "detention" and/or interrogation. Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

392 U.S. at 19 n.16.

As we observed in *State v. Staten, ante* p. 13, 18, 469 N.W.2d 112, 116 (1991): "[U]nder *Terry v. Ohio* . . . police can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the fourth amendment."

Thus, in Twohig's case, the crucial question is whether there was a "seizure" and, therefore, the fourth amendment safeguard against an unreasonable seizure, when Deputy Price encountered Twohig on 70th Street, stopped the cruiser, approached Twohig, and, in substance, asked Twohig: "Who are you? Where are you going? What are you doing?"

In *United States v. Mendenhall*, 446 U.S. 544, 554-55, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), the Supreme Court stated:

[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. . . . In the absence of some such evidence, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.

Later, in *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983), the U.S. Supreme Court considered a

situation involving two police officers who approached an individual suspected of transporting narcotics as the suspect was walking in an airport concourse. The detectives identified themselves as police officers, asked to speak to the suspect, and, when Royer agreed, obtained his plane ticket and driver's license and then, while retaining those documents, asked Royer to accompany them to a security room in the airport. According to the Court:

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. . . . Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *United States v. Mendenhall* [citation omitted]. The person approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. *Terry v. Ohio* [citation omitted]. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. *United States v. Mendenhall* [citation omitted]. If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

460 U.S. at 497-98.

In *Royer*, the Court concluded:

> Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth

Amendment. These circumstances surely amount to a show of official authority such that "a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall* 446 U.S., at 554 . . . .
460 U.S. at 501-02.

Shortly after *Royer*, the Court, in *INS v. Delgado*, 466 U.S. 210, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984), made the following observations and comments about an encounter between a citizen and police:

> As we have noted elsewhere: "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio* [citation omitted]. . . .
>
> Although we have yet to rule directly on whether mere questioning of an individual by a police official, without more, can amount to a seizure under the Fourth Amendment, our recent decision in *Royer* [citation omitted], plainly implies that interrogation relating to one's identity or a request for identification by the police does not, by itself, constitute a Fourth Amendment seizure. . . .
>
> . . . [P]olice questioning, by itself, is unlikely to result in a Fourth Amendment violation. While most citizens will respond to a police request, the fact that people do so, and do so without being told they are free not to respond, hardly eliminates the consensual nature of the response. . . . Unless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment. But if the person refuses to answer and the police take additional steps . . . to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure.

466 U.S. at 215-17.

Later, in *Michigan v. Chesternut*, 486 U.S. 567, 108 S. Ct.

1975, 100 L. Ed. 2d 565 (1988), the U.S. Supreme Court reaffirmed the *Mendenhall* test, namely, police have seized an individual

> "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." [466 U.S. at 554]. . . .
>
> The [*Mendenhall*] test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation. Moreover, what constitutes a restraint on liberty prompting a person to conclude that he is not free to "leave" will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs. . . .
>
> While the test is flexible enough to be applied to the whole range of police conduct in an equally broad range of settings, it calls for consistent application from one police encounter to the next, regardless of the particular individual's response to the actions of the police. The test's objective standard—looking to the reasonable man's interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. 3 W. LaFave, Search and Seizure § 9.2(h), pp. 407-408 (2d ed. 1987 and Supp. 1988). This "reasonable person" standard also ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual being approached.

486 U.S. at 573-74. See *California v. Hodari D.*, ____ U.S. ____, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) (crack cocaine tossed away by Hodari, who was fleeing from a police officer and was later tackled by the pursuing officer, was not obtained through a seizure of Hodari).

According to the *Mendenhall-Royer* test, enunciated and reaffirmed by the U.S. Supreme Court, if there is no detention or seizure within the meaning of the fourth amendment to the U.S. Constitution, then the fourth amendment safeguard against an unreasonable seizure is not implicated in an encounter between a private citizen and a police officer.

Thus, every encounter between a police officer and another individual in a public place, such as a public street, does not necessarily constitute a seizure of the individual. From *INS v. Delgado, supra*, we conclude that a police officer's merely questioning an individual in a public place, such as a request for the individual's identification, is not a seizure which is subject to the safeguard of the fourth amendment. A police officer may question a person without bringing about a seizure when the interrogation is carried on without interrupting or restraining the questioned person's movement. 3 W. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 9.2(h) (2d ed. 1987). As one court has observed:

> The mere knowledge by the person questioned that the person asking the questions is a police officer cannot in itself constitute a factor of threatened force because, were that so, every question put to a person under any circumstances by a self-identified police officer on duty would by that very fact constitute a *Terry* stop.

*People v. Jordan*, 43 Ill. App. 3d 660, 662-63, 357 N.E.2d 159, 162 (1976). See, also, *U.S. v. Tavolacci*, 895 F.2d 1423 (D.C. Cir. 1990) (so long as an encounter is not a detention, the fourth amendment is not implicated; a mere request for identification is not a seizure in relation to the fourth amendment); *U.S. v. Edwards*, 898 F.2d 1273 (7th Cir. 1990) (federal agents walked with defendant in the concourse of an Amtrak station and asked defendant questions which he voluntarily answered; no seizure); *State v. Culbreath*, 300 S.C. 232, 387 S.E.2d 255 (1990) (officer's request for defendant's identification and to see defendant's driver's license while defendant was seated in a parked vehicle; no seizure); *U.S. v. Gray*, 883 F.2d 320 (4th Cir. 1989) (federal agents walked with defendant in the stream of pedestrian traffic inside an airport and, without verbal or physical abuse or intimidation, asked for defendant's identification, which defendant delivered to the officers; no seizure); *State v. McGee*, 381 N.W.2d 630 (Iowa 1986) (officer's approach of suspect as the suspect was getting into a car, and simultaneously calling out the suspect's name, was not a seizure); *United States v. Barnes*, 496 A.2d 1040 (D.C. 1985) (without intimidating circumstances beyond the natural sense

of obligation almost anyone feels when a police officer asks a question, there is no *Terry* stop); *Lightbourne v. State*, 438 So. 2d 380 (Fla. 1983) (officer encountered defendant, seated in a car parked on a street, and asked the reason for defendant's presence and his address; no seizure); *United States v. Regan*, 687 F.2d 531, 535 (1st Cir. 1982) (no seizure where police "did not order him to stop" and "did not block his path," but only asked to speak with him); *State v. Alesso*, 328 N.W.2d 685 (Minn. 1982) (officer approached defendant's car on a public street late at night and talked with defendant; no seizure); *People v. King*, 72 Cal. App. 3d 346, 348, 139 Cal. Rptr. 926, 927 (1977) (officer called out, "Danny, stop, I want to talk to you"; no seizure).

Twohig generally and essentially substantiated Price's description of the roadside encounter and did not dispute any particular detail in that event recounted by Price. Consequently, while Deputy Price's cruiser was approaching on 70th Street and was being driven in a manner apparently indistinguishable from a citizen's operation of a private vehicle, that is, without any display of official capacity such as activated rotating or oscillating emergency lights, Twohig stood at the roadside to see who was approaching and stopping. When Price stepped out of his vehicle and approached Twohig, Price made inquiries which, in substance and content, were: "Who are you? Where are you going? What are you doing?" In that manner, Price simply asked Twohig for some identification. Price did not direct Twohig to stay in place or otherwise issue some command that Twohig remain stationary and not move away from the officer. In the early stage of the encounter, Price never blocked Twohig's path for departure or in any way physically restrained Twohig's freedom of movement. Price's inquiries, as far as the record reflects, were neither intense nor repetitive and were not presented in a threatening tone. Nothing in the setting suggests an atmosphere of intimidation or pressure brought to bear on Twohig, whose responses to Price's inquiries cannot reasonably be characterized as anything but voluntary. Moreover, before being "frisked" and placed in the cruiser, Twohig was free to walk away and continue his trek down 70th Street. We need not embark on a discussion about

the hypothetical situation and consequences of Twohig's attempt to leave and some form of responsive restraint by Price. In the final analysis, we find nothing to indicate that a reasonable person, in the circumstances of Twohig's case, would believe that the individual was prevented from leaving the officer's presence. Thus, in the initial encounter, before Price frisked Twohig and placed him in the cruiser, Price never "seized" and, therefore, never "detained" Twohig; hence, an articulable suspicion of criminal activity required for a "*Terry* stop" was unnecessary as a prerequisite for the initial encounter between Twohig and Price. For that reason, Twohig's first assignment of error is without merit.

In reviewing the setting for the initial encounter, we are not indicating that any particular circumstance, present in or absent from Twohig's case, determines whether there is a seizure, detention, or stop. Rather, we conclude that, in view of all the circumstances, the initial encounter in Twohig's case did not constitute a seizure within the meaning of U.S. Const. amend. IV or Neb. Const. art. I, § 7. Thus, we point out that there may be encounters or contacts between citizens and law enforcement officers without a resulting seizure, detention, or stop implicating the constitutional safeguard against unreasonableness in those situations.

### The Arrest.

Having determined that there was no "*Terry* stop," we proceed to the question whether Price had probable cause for his arrest of Twohig.

Before arresting Twohig for drunk driving, Price knew that there had been an automobile accident relatively near the site where Price encountered Twohig, that is, a collision in which a car belonging to a "Michael Twohig" had been driven from a public roadway into an adjacent ditch, where the vehicle sheared a power pole. Price's information also indicated that someone had been seen walking in the area of the accident. Within a short time after the accident, Price discovered a man "limping" northward along 70th Street away from the general area of the accident. Price embarked on a preliminary inquiry about the pedestrian's identity and the man's reason for

ambling near the edge of a road at midnight in an apparently unimproved area. As a result of that inquiry, Price found out that the man was "Twohig," the surname corresponding with the name of the registered owner of the vehicle which had collided with the power pole. Additionally, through the conversation with Twohig, Price learned that Twohig was "too drunk to drive."

"When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant." *State v. Blakely*, 227 Neb. 816, 821, 420 N.W.2d 300, 304 (1988). Accord, *State v. Staten, ante* p. 13, 469 N.W.2d 112 (1991); *State v. Roggenkamp*, 224 Neb. 914, 402 N.W.2d 682 (1987).

From all the circumstances, we conclude that Price had probable cause to arrest Twohig for drunk driving.

## CONSTITUTIONAL ADMISSIBILITY OF EVIDENCE FROM TWOHIG

*Search of Twohig's Person Without a Warrant.*

If police have acted without a search warrant, the State has the burden to prove that the search was conducted under circumstances substantiating the reasonableness of such search or seizure. . . .

In *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), the Supreme Court held that if there is a lawful arrest, police have authority, without a search warrant, to conduct a full search of the person arrested and that such search is reasonable under the fourth amendment to the U.S. Constitution. Further, a police officer's search is not limited to searching the arrested person for weapons only; the officer may search for and seize any evidence on the arrestee's person, even if such evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence.

(Citations omitted.) *State v. Staten, supra* at 21, 469 N.W.2d at 118. Accord, *State v. Juhl*, 234 Neb. 33, 449 N.W.2d 202

(1989); *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989); *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987). See, also, *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969).

"A search incident to a lawful arrest need not be made immediately on arrest." *State v. Staten, supra* at 21-22, 469 N.W.2d at 118.

In *Rawlings v. Kentucky*, 448 U.S. 98, 111, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980), the Supreme Court stated: "Where the formal arrest followed quickly on the heels of the challenged search of petitioner's person, we do not believe it particularly important that the search preceded the arrest rather than vice versa." In reference to the preceding language, the *Rawlings* Court added: "The fruits of the search of [Rawlings'] person were, of course, not necessary to support probable cause to arrest [Rawlings]." 448 U.S. at 111 n.6. Therefore, a search without a warrant before an arrest, also without a warrant, is valid as an incident to the subsequent arrest if (1) the search is reasonably contemporaneous with the arrest and (2) probable cause for the arrest exists before the search. See, *State v. Roach*, 234 Neb. 620, 452 N.W.2d 262 (1990); *U.S. v. Hernandez*, 825 F.2d 846 (5th Cir. 1987); *United States v. Gay*, 774 F.2d 368 (10th Cir. 1985); *United States v. Ilazi*, 730 F.2d 1120 (8th Cir. 1984); *United States v. Chatman*, 573 F.2d 565 (9th Cir. 1977); *Lee v. State*, 311 Md. 642, 537 A.2d 235 (1988); *State v. DeGrenier*, 128 N.H. 547, 517 A.2d 814 (1986); *People v Landy*, 59 N.Y.2d 369, 452 N.E.2d 1185, 465 N.Y.S.2d 857 (1983); *State v. Valenzuela*, 121 Ariz. 274, 589 P.2d 1306 (1979); *State v. Meadors*, 177 Mont. 100, 580 P.2d 903 (1978); *People v. Simon*, 45 Cal. 2d 645, 290 P.2d 531 (1955). However, a search before an arrest, and claimed to be an incident of the arrest, cannot serve as a basis for the validity of the arrest. *Smith v. Ohio*, 494 U.S. 541, 110 S. Ct. 1288, 108 L. Ed. 2d 464 (1990); *Sibron v. New York*, 392 U.S. 40, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968); *Johnson v. United States*, 333 U.S. 10, 68 S. Ct. 367, 92 L. Ed. 436 (1948). " '[J]ustify[ing] the arrest by the search and at the same time . . . the search by the arrest,' just 'will not do.' " *Smith v. Ohio, supra* at 494 U.S. at 543. See, also, *State v. Roach, supra*.

As we previously expressed in this opinion under the heading *"The Arrest,"* Price had probable cause to arrest Twohig for drunk driving. Therefore, Price's arrest of Twohig is constitutionally sustainable. Hence, Price's search of Twohig's person, even though the search occurred before the subsequent valid arrest, produced constitutionally admissible physical evidence, namely, the keys for Twohig's Chevrolet.

*Twohig's Custodial Statements.*

Twohig contends that his statements made to Price while the pair were in the cruiser should have been suppressed because Price did not administer the *Miranda* warning and admonition before the statements in question. In *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), the U.S. Supreme Court characterized "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." See, also, *State v. Brown*, 225 Neb. 418, 405 N.W.2d 600 (1987).

> Before a defendant's custodial statement is admissible as evidence, the absolute and indispensable prerequisites of the *Miranda* warning must have been satisfied preceding the interrogation producing such statement, namely, law enforcement personnel must (1) inform the defendant of the right to remain silent, (2) explain that anything said can and will be used against the defendant in court, and (3) inform the defendant of the right to consult with a lawyer and to have a lawyer present during interrogation. *Miranda v. Arizona, supra.* If a defendant to be interrogated is indigent, the defendant must also be informed that a lawyer will be appointed to represent the defendant.

*State v. Norfolk*, 221 Neb. 810, 814-15, 381 N.W.2d 120, 125 (1986). Accord, *State v. Gibson*, 228 Neb. 455, 422 N.W.2d 570 (1988); *State v. Brown, supra.*

Deputy Price testified that Twohig was not free to leave the cruiser during the time when Twohig made the statements sought to be excluded. Under the circumstances Twohig was in police custody inasmuch as he had been deprived of his freedom

to leave the cruiser. Therefore, without the *Miranda* warning or admonition, Twohig's statements to Price in the cruiser are constitutionally inadmissible.

An error which constitutes a violation or deprivation of a defendant's constitutional right and which enters into the defendant's conviction does not necessarily or always require automatic reversal of the conviction, if the error was harmless. In a situation involving the erroneous admission of constitutionally inadmissible evidence, "[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86-87, 84 S. Ct. 229, 11 L. Ed. 2d 171 (1963). See, also, *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

"Harmless error exists in a bench trial of a criminal case when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the court in a judgment adverse to a substantial right of the defendant." *State v. Schroder*, 232 Neb. 65, 71, 439 N.W.2d 489, 493 (1989). Accord, *State v. Vejvoda*, 231 Neb. 668, 438 N.W.2d 461 (1989); *State v. Snodgrass*, 230 Neb. 119, 430 N.W.2d 55 (1988). "Erroneous admission of evidence is harmless error and does not require reversal if the evidence erroneously admitted is cumulative and other relevant evidence, properly admitted, or admitted without objection, supports the finding by the trier of fact." *State v. Cox*, 231 Neb. 495, 504, 437 N.W.2d 134, 140 (1989). See *State v. Snodgrass, supra.*

Error by admission of constitutionally inadmissible evidence against a defendant is not reversible error unless, from all the evidence introduced in the defendant's trial, it appears that the defendant's conviction is realistically and highly more probable with the evidence and conversely improbable without the evidence. See *State v. Andersen*, 213 Neb. 695, 331 N.W.2d 507 (1983).

During custodial interrogation in the cruiser, Twohig acknowledged that he owned a "75 Chevy" and that he was "too drunk to drive." However, from our examination of Twohig's custodial statements to Price, we conclude that

Twohig's other custodial statements were generally exculpatory inasmuch as in those other statements Twohig denied driving any automobile involved in an accident. Twohig's custodial statements which tended to establish his guilt on the drunk driving charge were repetitious of statements made to Price before the custodial statements in question. Although Twohig did make the custodial statement "If I had hit a power pole, I wouldn't be walking," that statement is ambiguous at best. Nevertheless, we shall disregard Twohig's custodial statements to Price in the cruiser and examine the sufficiency of evidence supporting Twohig's conviction.

## SUFFICIENCY OF THE EVIDENCE

In determining whether evidence is sufficient to sustain a conviction in a bench trial, an appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, evaluate explanations, or reweigh evidence presented to a court as the fact finder, since such matters are within a fact finder's province for disposition. A conviction in the bench trial of a criminal case must be sustained if the evidence, viewed and construed most favorably to the State, is sufficient to support a finding of guilty. See, *State v. Oldfield*, 236 Neb. 433, 461 N.W.2d 554 (1990); *State v. Blue Bird*, 232 Neb. 336, 440 N.W.2d 474 (1989); *State v. Vejvoda, supra.*

"A defendant may be convicted by circumstantial evidence which establishes the defendant's guilt beyond a reasonable doubt. The State is required to establish the defendant's guilt for the crime charged, but is not required to disprove every hypothesis consistent with the defendant's presumed innocence." *State v. Blue Bird, supra* at 339, 440 N.W.2d at 476. Accord, *State v. Lonnecker*, 237 Neb. 207, 465 N.W.2d 737 (1991); *State v. Zitterkopf*, 236 Neb. 743, 463 N.W.2d 616 (1990); *State v. Pettit*, 233 Neb. 436, 445 N.W.2d 890 (1989).

" 'Circumstantial evidence' means facts or circumstances, proved or known, from which existence or nonexistence of another fact may be logically inferred or deduced through a rational process." *State v. Jasper*, 237 Neb. 754, 763, 467 N.W.2d 855, 862 (1991). Accord *State v. Loveless*, 234 Neb. 463, 451 N.W.2d 692 (1990).

We will not reiterate all the salient facts supporting a finding that Twohig was guilty of drunk driving. Those facts have been stated, and quite likely restated, elsewhere in this opinion.

Although the evidence is somewhat questionable in reference to a conviction for driving "under the influence," the charge against Twohig was stated in the alternative, that is, Twohig's driving while under the influence of alcoholic liquor or when he had a "concentration of .10 of one gram or more by weight of alcohol per 210 liters of his breath." See § 39-669.07. The results of the test on Twohig's breath clearly establish a violation of the breath alcohol provision in § 39-669.07. We conclude that the evidence supports a finding, beyond a reasonable doubt, that Twohig violated § 39-669.07 and that Twohig was "guilty as charged." Consequently, we conclude that introduction of Twohig's custodial statements as evidence in the trial on the drunk driving charge was harmless beyond a reasonable doubt.

## CONCLUSION

Twohig's conviction is constitutionally sustainable, with sufficient evidence to support his conviction for drunk driving.

AFFIRMED.

FAHRNBRUCH, J., not participating.