STATE OF NEBRASKA, APPELLEE, v. SHAWN J. STATEN, APPELLANT.

469 N.W.2d 112

Filed May 3, 1991.    No. 90-232.

Thomas M. Kenney, Douglas County Public Defender, and Cheryl M. Kessell for appellant.

Robert M. Spire, Attorney General, and Barry Waid for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

The State charged that Shawn J. Staten intended to deliver or distribute cocaine in her possession, a violation of Neb. Rev. Stat. § 28-416(1)(a) (Cum. Supp. 1988). In her suppression motions, Staten claimed that cocaine found on her person and her custodial statements were constitutionally inadmissible. See Neb. Rev. Stat. § 29-115 (Reissue 1989) (suppression of

accused's statement) and Neb. Rev. Stat. § 29-822 (Reissue 1989) (suppression of physical evidence). When the district court for Douglas County sustained Staten's motions, the State obtained a review by a judge of this court concerning the suppression orders. See Neb. Rev. Stat. §§ 29-116 and 29-824 (Reissue 1989). As a result of that review, the suppression orders were reversed. See *State v. Staten*, 233 Neb. 800, 448 N.W.2d 152 (1989). In a subsequent bench trial, Staten was convicted on the cocaine charge and sentenced to imprisonment.

## CONTACT AT THE AIRPORT

On the morning of March 29, 1989, in the Kansas City International Airport, Agent Carl Hicks of the Federal Drug Enforcement Agency was routinely observing arrival of flights from Los Angeles, California, and noticed a man and a woman, later identified as Tracy Wood and Staten, whom he described as "suspicious" inasmuch as the couple fit the drug courier profile. When Hicks approached the pair and asked them for identification, Wood and Staten said they had none. However, Staten later produced some identification and also displayed their plane tickets. Hicks noted that Wood and Staten had paid cash for their plane tickets and that they were flying to Omaha on Braniff Airline flight 1490, which was scheduled to arrive in Omaha at 8:30 that morning. Since no drug detection dog was available at Kansas City and because the couple's luggage was already on board the Omaha flight scheduled for departure in the next few minutes, Hicks terminated the interview with Wood and Staten, who boarded Braniff flight 1490 to Omaha.

Hicks telephoned Sgt. James Cisar of the Omaha Police Division and related Hicks' observations at the Kansas City International Airport. Cisar immediately called Sgt. William Agnew of the Omaha Police Division's narcotics unit. Agnew assembled a team of FBI agents and Omaha police officers, who went to Omaha's Eppley Airfield to meet Braniff flight 1490. Agnew also contacted Steve Sanchelli, an Omaha police officer who handles "Bush," a dog used for drug detection by the Omaha Police Division, and asked Sanchelli to bring Bush to the airport.

On arrival at the airport, the officers and the FBI agents went to gate 21, where flight 1490 was to arrive, and set up surveillance. When flight 1490 arrived at 8:30 a.m., the officers observed Wood and Staten disembark from the plane and walk to the baggage claim area. Staten made a phone call, after which she and Wood retrieved three pieces of luggage and began to walk toward the airport's main terminal area. Agnew approached Wood and Staten, identified himself as a police officer conducting a "narcotics investigation," and asked them to produce their plane tickets. Staten said she had discarded her ticket on the plane. When Agnew asked for some identification, Staten showed Agnew a copy of a birth certificate and her Social Security card. Agnew told Wood and Staten that a drug detection dog was en route to the airport and asked whether they would consent to having the dog "sniff" their luggage for the possible presence of controlled substances. Staten agreed to let the dog sniff her luggage, which included a brown "two suiter suitcase" bearing a Braniff identification tag: "Shawn Staten, 15546 Friar Street, Van Nuys, California."

Wood and Staten accompanied the officers to the airport security area, where Agnew asked Staten about the reason for her presence in Omaha. Staten responded that she was visiting her brother, Harry Harris. Agnew knew that Harry Harris, an alias for Dan Staten, was in custody. Harris was a member of a Los Angeles gang and was "involved in narcotics activity" in Omaha. Also, Agnew had personally arrested Staten's sister, Mowesha Staten, in an Omaha motel for possession of a controlled substance.

Approximately 15 minutes after Staten had arrived in Omaha, Officer Sanchelli arrived at the airport with Bush, the drug detection dog. Bush had been specially trained in locating cocaine, heroin, and other controlled substances and was used to "alert" officers to the presence of a controlled substance within luggage. The "alert" consists of Bush's sniffing luggage and then biting or scratching luggage which contains a controlled substance. Before Staten encountered the officers at the Eppley Airport, Bush had positively verified controlled substances in "50 controlled alerts" and had located a controlled substance in luggage on 18 separate occasions.

Staten's luggage was placed in the airport hallway for Bush's "off-leash" sniffing. As the dog was sniffing Staten's luggage, "Bush alerted violently by biting and scratching" at Staten's "two suiter" suitcase, an indication that the luggage contained a controlled substance such as cocaine. After Bush "alerted on" Staten's suitcase, Agnew requested permission to search Staten's person and luggage. Staten told Agnew that he could search her luggage but not search her. When Agnew said that "a female officer would conduct the search in the privacy of a room," Staten still refused to permit a search of her person. According to Agnew: "At that point I informed [Staten] that she was under arrest for suspicion of possession of a controlled substance and she would be taken to central police headquarters and we were going to apply for a search warrant for her luggage and her person." No one questions that Staten was arrested for possession of a controlled substance at the airport. The officers then transported Staten to police headquarters.

At police headquarters, Staten was taken to an interview room where, shortly after 10 a.m., Officer James Haiar presented her with a *Miranda* "rights advisory form." Although Staten refused to make a statement, a few minutes later she indicated to officers that she would be willing to make a statement. Meanwhile, Agnew had prepared an application for a search warrant. In his affidavit for the search warrant, Agnew recounted the details preceding and during his encounter with Staten at the airport. Based on Agnew's affidavit, the county court for Douglas County issued a search warrant at 1:25 p.m. Shortly thereafter, in the presence of a female police officer, the warrant, which authorized a search of Staten's person and her luggage, was served on Staten. After Staten read the warrant, which she understood, she removed a plastic bag, containing 6 ounces of cocaine, from her bra. The police presented a second "advisory form" regarding the *Miranda* admonition. Staten indicated that she understood her rights, and then discussed her possession of the substance found in her possession. Staten told the police that she was transporting the substance, "crack" cocaine, from Los Angeles to Omaha for distribution and sale. A later laboratory test

confirmed that the substance in Staten's possession was cocaine.

## STATEN'S CONVICTION AND SENTENCE

Staten objected, claiming that the cocaine and her custodial statements were constitutionally inadmissible. After Staten's objections were overruled, the district court, presented with the foregoing facts, found Staten guilty of the cocaine charge and sentenced her to imprisonment for a term of 4 to 8 years.

## ASSIGNMENTS OF ERROR

For her assignments of error, Staten contends: (1) "The search of the Defendant's person which revealed cocaine hidden in her undergarments was illegal; the fruits of that search should have been suppressed," and (2) "The sentence imposed by the District Court was excessive, and as such, constitutes an abuse of discretion."

## CONSTITUTIONAL ADMISSIBILITY OF
## PHYSICAL EVIDENCE FROM STATEN

*Arrest of Staten.*

Staten claims that the search of her person was unreasonable and, therefore, a violation of U.S. Const. amend. IV and Neb. Const. art. I, § 7.

Although Staten neither questions the factual basis for the police stopping her at the airport nor asserts that any constitutional right was violated by her detention at the airport, nevertheless, we note that, under *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), police can constitutionally stop and briefly detain a person for investigative purposes if the police have a reasonable suspicion, supported by articulable facts, that criminal activity exists, even if probable cause is lacking under the fourth amendment. See, also, *State v. Thomte*, 226 Neb. 659, 413 N.W.2d 916 (1987). Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized suspicion or "hunch," but less than the level of suspicion required for probable cause. *United States v. Sokolow*, 490 U.S. 1, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989).

The U.S. Supreme Court has held that persons whose

appearance and activities fit the so-called drug courier profile may be briefly detained by law enforcement officers under *Terry v. Ohio*. See, *United States v. Place*, 462 U.S. 696, 103 S. Ct. 2637, 77 L. Ed. 2d 110 (1983); *Florida v. Royer*, 460 U.S. 491, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983); *United States v. Sokolow, supra*. The drug courier profile is a compilation of characteristics found to be typical for persons transporting illegal drugs, such as trips to and from cities which are major sources of drugs, with short stays in the cities; cash payment for tickets; use of aliases; unchecked luggage and little or no identification on luggage; attire; and nervousness. See *United States v. Sokolow, supra*.

In *Florida v. Royer, supra*, the U.S. Supreme Court held that police had no probable cause to arrest the defendant based upon the facts that he was traveling from Miami to New York City under an assumed name; that he was carrying two suitcases that appeared to be heavy; that he was young, was casually dressed, and appeared to be pale and nervous; and that he had paid for his ticket in cash with a large number of bills. The fact that defendant fit the so-called drug courier profile constituted adequate grounds for suspecting the defendant of carrying drugs and justified an investigatory stop by police officers. *Id.* However, because the police took the defendant to a small room for further interrogation, retrieved his checked luggage from the airline, took his airplane ticket and identification, and never informed defendant that he was free to leave at any time nor that he need not consent to the search of his luggage, the Supreme Court held that the investigatory stop exceeded the constitutional limitation of a *Terry* stop. See *Terry v. Ohio, supra*. The *Royer* Court found that the means employed by the police officers were too intrusive in relation to an investigative detention and that restraint of the defendant was unjustified, and then concluded that there were less intrusive means which the officers could have employed, while noting:

> The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage. There is no indication here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this

investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed [the defendant] in short order; a positive result would have resulted in his justifiable arrest on probable cause.

460 U.S. at 505-06.

The use of a specially trained dog to detect the presence of a controlled substance inside a container, such as luggage, has been held to be a feasible and expeditious way to detain a suspect for the shortest period of time in which to confirm or dispel suspicions. See *Florida v. Royer, supra.* See, also, *United States v. Place, supra* (canine sniff discloses only the presence or absence of narcotics, and such limited disclosure ensures against the embarrassment and inconvenience of the owner that is possible with other, more intrusive means of investigation). This conclusion is based on the fact that dogs trained especially for the purpose of detecting a controlled substance can detect the presence of concealed narcotics with almost unerring accuracy.

As expressed in *State v. Blakely*, 227 Neb. 816, 821, 420 N.W.2d 300, 304 (1988):

A valid search as an incident to an arrest without a warrant necessarily depends on the legality of the arrest itself. . . .

. . . [T]he constitutional issue regarding a reasonable search, as an incident of a felony arrest without a warrant, depends on the presence or absence of probable cause for that arrest, that is, whether immediately before the search an officer has probable cause to believe that the person to be searched has committed a felony.

When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant.

Several courts have held that an "alert" by a trained drug detection dog constitutes probable cause for arrest. See, *People v. Unruh*, 713 P.2d 370 (Colo. 1986); *People v Price*, 54 N.Y.2d 557, 431 N.E.2d 267, 446 N.Y.S.2d 906 (1981); *People v.*

*Campbell*, 67 Ill. 2d 308, 367 N.E.2d 949 (1977); *Morrow v. State*, 757 S.W.2d 484 (Tex. App. 1988) (even in the absence of consent to search, a drug detection dog's "alert" to the presence of narcotics in defendant's luggage would have justified the arrest of appellant); *Pooley v. State*, 705 P.2d 1293 (Alaska App. 1985); *State v. Bullock*, 460 So. 2d 517 (Fla. App. 1984). See, also, *U.S. v. Massac*, 867 F.2d 174 (3d Cir. 1989); *U.S. v. Stone*, 866 F.2d 359 (10th Cir. 1989); *Garmon v. Foust*, 741 F.2d 1069 (8th Cir. 1984); *United States v. Spetz*, 721 F.2d 1457 (9th Cir. 1983); *United States v. Robinson*, 707 F.2d 811 (4th Cir. 1983); *United States v. Waltzer*, 682 F.2d 370 (2d Cir. 1982); *United States v. Klein*, 626 F.2d 22 (7th Cir. 1980); *United States v. Race*, 529 F.2d 12 (1st Cir. 1976).

In view of the officers' information about Staten and from all the circumstances at the airport, including Bush's "alert" and positive reaction to Staten's luggage, the police had probable cause to arrest Staten at the airport. Consequently, Staten's arrest withstands constitutional challenge.

*Search Without a Warrant.*

If police have acted without a search warrant, the State has the burden to prove that the search was conducted under circumstances substantiating the reasonableness of such search or seizure. *State v. Juhl*, 234 Neb. 33, 449 N.W.2d 202 (1989); *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989); *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987).

In *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973), the Supreme Court held that if there is a lawful arrest, police have authority, without a search warrant, to conduct a full search of the person arrested and that such search is reasonable under the fourth amendment to the U.S. Constitution. Further, a police officer's search is not limited to searching the arrested person for weapons only; the officer may search for and seize any evidence on the arrestee's person, even if such evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence. See, also, *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969).

A search incident to a lawful arrest need not be made

immediately on arrest. "[S]earches and seizures that could be made on the spot at the time of arrest may legally be conducted later when the accused arrives at the place of detention." *United States v. Edwards*, 415 U.S. 800, 803, 94 S. Ct. 1234, 39 L. Ed. 2d 771 (1974). See, also, *Abel v. United States*, 362 U.S. 217, 80 S. Ct. 683, 4 L. Ed. 2d 668 (1960). See, further, *State v. Weible*, 211 Neb. 174, 317 N.W.2d 920 (1982) (arresting officers may search person of arrestee to discover and remove weapons and to seize evidence to prevent its concealment or destruction, as well as search the area within the arrestee's immediate control); *State v. McElroy*, 189 Neb. 376, 202 N.W.2d 752 (1972) (arrest of defendant and later search of defendant's person at police station held lawful).

The search of Staten's person, without a search warrant but as an incident of her lawful arrest, is not unreasonable and, therefore, does not violate the constitutional protection against an unreasonable search and seizure.

*Search With a Warrant.*

Although a search warrant was unnecessary for a valid search of Staten's person and was surplusage in relation to a search as an incident of a lawful arrest, the police, nonetheless, obtained a warrant to search Staten's person. However, Staten does not challenge the truth, accuracy, or sufficiency of the information which Agnew supplied in his affidavit for the search warrant.

> [T]he burden of proof depends on the basis for the search, that is, whether the search was conducted pursuant to a warrant or without a warrant. If police have acted pursuant to a search warrant, the defendant bears the burden of proof that the search or seizure is unreasonable; but if police acted without a search warrant, the State has the burden of proof that the search was conducted under circumstances substantiating the reasonableness of such search or seizure.

*State v. Vrtiska, supra* at 461, 406 N.W.2d at 120. See, also, *United States v. Longmire*, 761 F.2d 411 (7th Cir. 1985); 4 W. LaFave, Search and Seizure, a Treatise on the Fourth Amendment § 11.2(b) (2d ed. 1987).

Thus, a defendant who seeks to suppress evidence obtained pursuant to a search warrant has the burden of establishing that the search warrant is invalid so that evidence secured thereby may be suppressed. *State v. Vrtiska, supra.*

In his affidavit, Agnew supplied sufficient information which established probable cause necessary for a constitutionally valid search warrant. Because validity or legality of the warrant in this case is unchallenged, Staten had the burden to establish that the search of her person was unreasonable and, therefore, contrary to the constitutional safeguards against an unreasonable search. However, since Staten presented nothing to demonstrate that the search warrant was deficient in any respect or for any reason and has failed to show that the search of her person was otherwise unreasonable, Staten has not established that the cocaine, obtained from her person as the result of a search warrant, is constitutionally inadmissible.

*Admissibility of Physical Evidence.*

Since the physical evidence was obtained through a reasonable search and seizure, the cocaine, obtained from Staten's person, was constitutionally admissible evidence used for Staten's conviction on the cocaine charge.

## STATEN'S CUSTODIAL STATEMENTS

As an additional aspect of the search and seizure question, Staten claims that her custodial statements, as "fruits of that search," are constitutionally inadmissible evidence and should have been suppressed. Thus, Staten contends that her custodial statements should have been suppressed because her statements were the product of an illegal search or, as condemned by *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963), were the "fruit of the poisonous tree." In *Wong Sun*, the U.S. Supreme Court required exclusion not only of evidence directly produced by a constitutionally invalid search, but also of evidence indirectly derived from the unconstitutional search. Reference to "fruit of the poisonous tree" in *Wong Sun* is a condemnation of the government's subsequent exploitation of a prior violation of a defendant's constitutional right. As expressed in *Wong Sun*, whether

evidence is the derivative product of a constitutionally invalid search turns on the question " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." 371 U.S. at 488.

However, since the arrest and search of Staten are constitutionally sustainable, the *Wong Sun* doctrine is inapplicable as a bar to admissibility of Staten's custodial statements. Cf. *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989) (defendant's voluntary custodial statements to police, after defendant was confronted with physical evidence seized during a constitutionally invalid search, were inadmissible in the prosecution of a charge related to the subject matter of the custodial interrogation). Therefore, Staten's statements were constitutionally admissible as evidence on the cocaine charge against Staten.

## EXCESSIVE SENTENCE CLAIM

Finally, Staten contends that her sentence to a term from 4 to 8 years is excessive.

A defendant's intent to distribute cocaine in the defendant's possession is a Class II felony, see § 28-416(2), which is punishable by imprisonment for a minimum term of 1 year and a maximum term of 50 years. See Neb. Rev. Stat. § 28-105(1) (Reissue 1985) (felony; classification of penalties; sentences).

Staten requests that this court reduce her sentence, see Neb. Rev. Stat. § 29-2308 (Reissue 1989), inasmuch as the cocaine charge "involved no threat of violence in any way." Brief for appellant at 9.

Although Staten's commission of the crack cocaine offense did not involve immediate physical force exerted against another person, the crime involves activity which is destructive to human beings and eventually results in harm evident from the physical and emotional injury to users of cocaine.

Although Staten has no record of prior arrests, she is an adult who cannot claim ignorance of crack and its consequences. Moreover, Staten willingly became an

instrument for distribution of cocaine for her personal gain. "A sentence imposed within the statutory limits will not be disturbed on appeal unless the sentencing court has abused its discretion in the sentence imposed." *State v. Kitt*, 232 Neb. 237, 240, 440 N.W.2d 234, 236 (1989). Accord, *State v. Zitterkopf*, 236 Neb. 743, 463 N.W.2d 616 (1990); *State v. Dillon*, 222 Neb. 131, 382 N.W.2d 353 (1986).

The district court did not abuse its discretion in the sentence imposed on Staten. We find no justifiable reason to reduce that sentence. Therefore, we affirm the sentence imposed on Staten.

### CONCLUSION

The evidence used to convict Staten was constitutionally admissible. We decline to reduce Staten's sentence, in which there has been no abuse of discretion.

AFFIRMED.