STATE OF NEBRASKA, APPELLEE, V. CLIFFORD D. THOMAS, APPELLANT.

483 N.W.2d 527

Filed April 23, 1992.    No. S-90-726.

J. Mark Barnett, of Jewell, Gatz, Collins, Dreier & Fitzgerald, for appellant.

Don Stenberg, Attorney General, and Barry Waid for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

As the result of a bench trial in the district court for Douglas County, Clifford D. Thomas was convicted of intending to sell crack cocaine which was in his possession, a violation of Neb. Rev. Stat. § 28-416(1)(a) (Reissue 1989).

In his pretrial motion to suppress the cocaine as physical evidence, see Neb. Rev. Stat. § 29-822 (Reissue 1989) (suppression of physical evidence obtained by unlawful search and seizure), Thomas claimed that the cocaine evidence was obtained contrary to the Fourth Amendment to the U.S. Constitution and article I, § 7, of the Nebraska Constitution,

through a warrantless and unreasonable search of his person, after police stopped the automobile driven by Thomas immediately before his arrest. Additionally, Thomas claimed that, although police had a search warrant for his residence, the search of his residence was unconstitutional, because police conducted an exploratory or general search. After the district court overruled the suppression motion, Thomas renewed his objection to the evidence at trial. From his conviction, Thomas appealed.

## STANDARD OF REVIEW;
## BURDENS REGARDING SEARCHES

In determining the correctness of a trial court's ruling on a motion to suppress evidence claimed to be constitutionally inadmissible, an appellate court will uphold the trial court's findings of fact unless those findings are clearly erroneous. In reviewing a trial court's findings on a suppression motion, an appellate court recognizes the trial court as the "trier of fact" and takes into consideration that the trial court has observed witnesses testifying regarding such motion. See, *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Abdouch*, 230 Neb. 929, 434 N.W.2d 317 (1989); *State v. Blakely*, 227 Neb. 816, 420 N.W.2d 300 (1988); *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987).

"If police have acted without a search warrant, the State has the burden to prove that the search was conducted under circumstances substantiating the reasonableness of such search or seizure." *State v. Staten*, 238 Neb. 13, 21, 469 N.W.2d 112, 118 (1991). Accord, *State v. Juhl*, 234 Neb. 33, 449 N.W.2d 202 (1989); *State v. Abdouch, supra*; *State v. Vrtiska, supra*.

"[A] defendant who seeks to suppress evidence obtained pursuant to a search warrant has the burden of establishing that the search warrant is invalid so that evidence secured thereby may be suppressed." *State v. Staten*, 238 Neb. at 23, 469 N.W.2d at 119. Accord *State v. Vrtiska, supra*.

## THE STOP AND SEARCH

*Stopping the Vehicle.*

Around 7 p.m. on November 24, 1989, Officer Mark Sundermeier, a member of the Omaha Police Department's

narcotics unit, received a telephone call from a confidential informant who told Sundermeier that, shortly before the call, the informant had observed three males who were selling crack cocaine out of a 1981 black Cadillac, bearing Nebraska license plates 1-GA252, in the vicinity of 24th and Sprague Streets in Omaha, an area with a "high level of drug activity" where "individuals will wait in cars in that area and sell to customers who come up to cars." The informant described the Cadillac's occupants, including the driver, whom he identified as "Clifford," estimated to be 24 to 25 years old. According to the informant, Clifford had shown crack cocaine to him and offered to sell the crack cocaine to the informant. Clifford told the informant that he was leaving, but would be returning to the 24th and Sprague location that evening to sell cocaine.

At the suppression hearing, and without objection, Sundermeier testified concerning the informant's reliability:

[The informant] has provided information to me in my capacity as a narcotics officer for over two years. The informant has made numerous purchases of crack cocaine, marijuana, Ritalin and Talwin and is personally familiar with these drugs. I've used this informant on numerous occasions to obtain search warrants and to make arrests of individuals for felony drug offenses.

Sundermeier further testified that the informant has never proved unreliable.

Sundermeier relayed the information to his supervisor, Sgt. Mark Langan, and the officers decided to go in unmarked cars to 24th and Sprague and check out the informant's message about drug activity. While en route to 24th and Sprague, Sundermeier verified the license number of the 1981 Cadillac and learned that the car was registered to Kenette Kemp, whose address was 2515 Himebaugh Avenue in Omaha. On arrival at 24th and Sprague, Sundermeier and Langan searched the area for the 1981 Cadillac. When they were unable to locate the Cadillac, the officers proceeded a few blocks north to 2515 Himebaugh Avenue, arriving there at 7:15 p.m., and found the Cadillac unoccupied and parked across the street from the house on Himebaugh. After matching the Cadillac's license number with the number supplied by the informant, the

officers set up surveillance of the vehicle. Around 8 p.m., the officers observed two males walk across the street from 2515 Himebaugh Avenue and enter the Cadillac. The two men were of medium height and build and their descriptions were consistent with those given by the informant.

The Cadillac left and proceeded east on Himebaugh Avenue toward 24th Street. Sundermeier and Langan, in unmarked cars, followed the Cadillac and radioed for assistance from Officers John Neaman and Tim Anderson, who were on area patrol in a "uniformed cruiser." When the Cadillac reached 24th Street, it made a right turn and proceeded south a short distance to Taylor Street. When the Cadillac reached the intersection of 24th and Taylor and then turned west on Taylor, Langan ordered Neaman and Anderson, who were in their cruiser immediately behind the Cadillac, to initiate a traffic stop. Anderson activated the cruiser's "red lights" to effectuate the stop. Although the Cadillac slowed to approximately 5 miles per hour, it did not come to a complete stop until Sundermeier pulled his unmarked car ahead of the Neaman-Anderson cruiser and positioned his car directly in front of the Cadillac. The police officers used their three vehicles to "sandwich" the Cadillac against the curb and thereby prevent its leaving.

*Search of Thomas.*

Sundermeier and Langan got out of their cars in front of the Cadillac and approached that vehicle, while Officers Neaman and Anderson were simultaneously approaching from the rear of the Cadillac. As the police officers approached, Sundermeier repeatedly shouted to the occupants to place their hands where the officers could see them. When the individuals inside the car failed to comply, Sundermeier drew his revolver and pointed it at the man in the passenger seat, later identified as David Ross. While Sundermeier was walking toward the Cadillac, Ross reached into his pocket and "removed a white rock about the size of a small marble and placed it in his mouth" and "appeared to . . . begin swallowing it." As Sundermeier related, "It appeared to me to be crack cocaine." Officer Neaman, approaching from the rear of the Cadillac, came up to

the passenger-side door and attempted to open it, but discovered the door was locked. Neaman ordered Ross to unlock the door and, when Ross failed to respond, broke out the car window, reached inside and opened the door, removed Ross, and "secured" him.

During Neaman's encounter with Ross, Langan and Anderson were approaching the driver's side of the Cadillac and asked the driver, subsequently identified as Clifford Thomas, to step out of the car, which he did, and the officers conducted a pat-down search for weapons on Thomas. In the course of this pat-down search, Langan asked Thomas his name, and Thomas said, "Clifford." Langan testified that, at that point, "I immediately advised him he was under arrest in connection with crack cocaine, and I instructed Officer, I believe, Anderson to search [Thomas] incident to that arrest." While Anderson was searching Thomas, Langan "observed Officer Anderson pull a bag of crack cocaine out from the front of [Thomas'] pants. . . . It turned out to be nine grams." Later, laboratory analysis confirmed that the substance in the bag was crack cocaine. As a result of searching Thomas, Anderson also found $527 in cash located in three of Thomas' pants pockets.

After Thomas' arrest, Sundermeier asked him for permission to search "his residence at 2515 Himebaugh." Thomas told Sundermeier that he did not live at 2515 Himebaugh, but was just staying there, although Thomas did have a key to the front door of the house at that address. When Thomas rejected the officer's request to search 2515 Himebaugh, he was then placed in a cruiser and transported to the police station. A search of the Cadillac disclosed a receipt for brake work on the Cadillac, dated October 24, 1989, showing Thomas' residence as 2515 Himebaugh Avenue.

*At Police Headquarters.*

At police headquarters, Officer Donald Truckenbrod administered the *Miranda* warning or admonition to Thomas and then questioned him. During the interrogation, Truckenbrod told Thomas that the combination of 9 grams of crack cocaine and $527 in cash indicated that Thomas was involved in the sale of crack cocaine. Thomas responded that he

was not involved in selling cocaine, that he was only a user, and the reason he was carrying a large quantity of crack cocaine was because he "uses a great deal of cocaine."

*The Search of 2515 Himebaugh.*

Later in the evening of November 24, 1989, Officer Sundermeier applied for a warrant to search 2515 Himebaugh for: "Cocaine, it's [sic] derivatives, and the administering instruments. Monies and records pertaining to an illegal narcotics operation. Items of venue which would tend to identify the individuals residing or in control of said residence . . . ." To support his application, Sundermeier submitted his affidavit, setting out the need for a search warrant and recounting the events leading up to Thomas' arrest, including the information provided by the informant, the surveillance near 2515 Himebaugh, and the stop and arrest of Thomas and Ross. Further, Sundermeier's affidavit expressed that a confidential informant, who had proven reliable in the past, had been contacted and asked to purchase crack cocaine by a person who matched Thomas' description and drove a black Cadillac with Nebraska plates 1-GA252. On the basis of Sundermeier's affidavit, a search warrant was issued for 2515 Himebaugh in accordance with the scope specified in Sundermeier's application.

Sundermeier and several other officers executed the search warrant on November 24, 1989, and, in the course of the search, found, among other items, a small amount of marijuana, a .25-caliber automatic pistol, a .22-caliber single-action revolver, and several items showing Thomas' residence as 2515 Himebaugh Avenue, including merchandise receipts signed to Thomas for deliveries at the Himebaugh address and a postcard addressed to Thomas at that address.

## THOMAS' TRIAL

Thomas' bench trial was conducted on stipulated evidence contained in the police report regarding Thomas' arrest, including Thomas' statement at police headquarters. However, concerning the police report, Thomas renewed his objection based on the grounds previously expressed in his suppression motion, that is, an objection to

[a]ny and all statements or evidence contained in [the police report] that were obtained subsequent to the stop of [Thomas'] vehicle . . . on the grounds that it was obtained as a result of an illegal search, and without a valid search warrant in violation of [Thomas'] fourth amendment rights and his rights under [the] Nebraska constitution.

Additionally, Thomas objected to items seized at the 2515 Himebaugh residence as "beyond the scope of the search warrant." Further, Thomas objected to "all items seized from either the Defendant's vehicle or the premises at 2515 Himebaugh on the grounds of relevancy."

Through stipulation, the State introduced a recitation of Sergeant Langan's experience and training with the Omaha Police Department, namely, Langan had over 12 years' experience and has attended and conducted several seminars regarding drug investigations. Further, based on his experience and training, Langan, if called as a witness, would testify that 9 grams of crack cocaine is generally too large an amount for personal use, that such quantity of crack cocaine has an estimated street value of $1,800 to $2,250 and can be divided into 90 individual doses for sale or personal use, and that persons trafficking in crack cocaine will often carry large amounts of cash on their person.

## ASSIGNMENTS OF ERROR

Thomas' assignments of error may be summarized as follows: (1) The police officers unconstitutionally stopped the car driven by Thomas, and therefore, the cocaine, discovered after the stop, is constitutionally inadmissible as the product of an unreasonable search and seizure; (2) the search at 2515 Himebaugh was unconstitutional; hence, evidence from the search is constitutionally inadmissible; (3) evidence obtained in the search of 2515 Himebaugh lacked probative value and, therefore, was irrelevant and inadmissible; and (4) the evidence is insufficient to sustain Thomas' conviction.

## CONSTITUTIONALITY OF STOP AND SEARCH
*Stop of Vehicle.*

To determine whether any physical evidence is constitutionally inadmissible in Thomas' case, we must first

examine the circumstances surrounding the officers' stop of the vehicle driven by Thomas, for, if the initial stop was unconstitutional, any subsequent search and evidence obtained through that search are constitutionally inadmissible as the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).

> In *Wong Sun,* the U.S. Supreme Court required exclusion not only of evidence directly produced by a constitutionally invalid search but also evidence indirectly derived from the unconstitutional search. Reference to "fruit of the poisonous tree" in *Wong Sun* is a condemnation of the government's subsequent exploitation of a prior violation of a defendant's constitutional right: As expressed in *Wong Sun,* whether evidence is the derivative product of a constitutionally invalid search turns on the question " 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' " 371 U.S. at 488. (Quoting from J. Maguire, Evidence of Guilt (1959).)

*State v. Abdouch*, 230 Neb. 929, 943-44, 434 N.W.2d 317, 326 (1989).

Thomas contends that the police did not have a reasonable suspicion, supported by articulable facts, that he "had been, is or was about to be engaged in criminal activity." Brief for appellant at 12. See *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Next, Thomas claims that his detention by police transcended the brief and limited "stop and frisk" encounter authorized by *Terry* and, instead, became a seizure, requiring probable cause rather than reasonable suspicion for an investigatory stop.

> In *Terry v. Ohio, supra*, the U.S. Supreme Court stated:
>
> It is quite plain that the Fourth Amendment governs "seizures" of the person which do not eventuate in a trip to the station house and prosecution for crime—"arrests" in traditional terminology. It must be recognized that whenever a police officer accosts an individual and

restrains his freedom to walk away, he has "seized" that
person.

392 U.S. at 16.

Additionally, "a police officer may in appropriate
circumstances and in an appropriate manner approach a person
for purposes of investigating possible criminal behavior even
though there is no probable cause to make an arrest." *Terry v.
Ohio*, 392 U.S. at 22. Thus, "under *Terry v. Ohio* . . . police can
constitutionally stop and briefly detain a person for
investigative purposes if the police have a reasonable suspicion,
supported by articulable facts, that criminal activity exists,
even if probable cause is lacking under the fourth amendment."
*State v. Staten*, 238 Neb. 13, 18, 469 N.W.2d 112, 116 (1991).
Accord *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344
(1991). However, *Terry* involved a police officer's firsthand
observations of suspected criminal activity, whereas Thomas'
case involves officers who saw no singularly suspicious activity
before they halted Thomas' car, but stopped the car on the basis
of a factual account from an informant and, further, based on
the officers' experience in investigating drug activity and
offenses.

The U.S. Supreme Court has addressed the question whether
and under what circumstances an informant's tip can justifiably
provide a police officer with knowledge about "specific and
articulable facts which, taken together with reasonable
inferences drawn from those facts," *Terry v. Ohio*, 392 U.S. at
21, furnish a basis for the limited intrusion embodied in an
investigatory stop. In *Adams v. Williams*, 407 U.S. 143, 92 S.
Ct. 1921, 32 L. Ed. 2d 612 (1972), a police officer on patrol duty
learned from a reliable informant that Williams, seated in a
nearby parked automobile, was carrying narcotics and a
weapon. In light of that information, the officer went to
Williams' car and asked him to open the car's door. Williams
responded instead by rolling down the car's window, at which
point the police officer reached to where the informant had said
the weapon would be and withdrew the gun. The officer
arrested Williams for unlawful possession of a firearm. As the
result of the arrest, a search revealed heroin on Williams'
person and in his car. In *Adams*, the Court concluded that the

evidence found on Williams and in his car was constitutionally admissible, and said:

> In *Terry* this Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." . . . The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. . . . A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

407 U.S. at 145-46.

The *Adams* Court continued:

> [W]e believe that [the officer] acted justifiably in responding to his informant's tip. The informant was known to him personally and had provided him with information in the past. This is a stronger case than obtains in the case of an anonymous telephone tip. The informant here came forward personally to give information that was immediately verifiable at the scene. . . . Thus, while the Court's decisions indicate that this informant's unverified tip may have been insufficient for a narcotics arrest or search warrant [citations omitted], the information carried enough indicia of reliability to justify the officer's forcible stop of Williams.
>
> In reaching this conclusion, we reject respondent's argument that reasonable cause for a stop and frisk can only be based on the officer's personal observation, rather than on information supplied by another person. Informants' tips, like all other clues and evidence coming to a policeman on the scene, may vary greatly in their value and reliability.

407 U.S. at 146-47.

More recently, in *Alabama v. White*, 496 U.S. 325, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990), the Court examined the relationship between an informant's reliability and corroboration required to justify an investigatory stop based on an informant's tip. In *White*, police received a call from an anonymous informant that White would soon leave an identified apartment at a particular time in a brown Plymouth station wagon and would be traveling to a named motel. The informant said that White would be in possession of cocaine. Police officers observed a woman leave the apartment identified by the informant, get into the brown Plymouth station wagon, and drive in the general direction of the motel named by the informant. At that point, the police stopped White, informed her that she had been stopped because she was suspected of carrying narcotics, and, with White's consent, searched her purse and found cocaine. The Court in *White* first noted that an anonymous tip, standing alone, generally is insufficient to support a stop because the tip indicates nothing about the informant's reliability or basis of knowledge. In *White*, 496 U.S. at 331, the Court determined that "the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion" for a *Terry* stop, and explained:

> *Adams v. Williams* [citation omitted] sustained a *Terry* stop and frisk undertaken on the basis of a tip given in person by a known informant who had provided information in the past. We concluded that, while the unverified tip may have been insufficient to support an arrest or search warrant, the information carried sufficient "indicia of reliability" to justify a forcible stop.
>
> . . .
>      . . . .
>
> The opinion in [*Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)] recognized that an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations and given that the veracity of persons supplying anonymous tips is "by hypothesis largely unknown, and

unknowable." . . . This is not to say that an anonymous caller could never provide the reasonable suspicion necessary for a *Terry* stop. . . . Simply put, a tip such as this one [in White's case], standing alone, would not " 'warrant a man of reasonable caution in the belief' that [a stop] was appropriate."

496 U.S. at 328-29. The Court continued in *White*:

[The Court stated] in *United States v. Sokolow*, 490 U. S. 1, 7 [109 S. Ct. 1581, 1585, 104 L. Ed. 2d 1] (1989):

"The officer [making a *Terry* stop] . . . must be able to articulate something more than an 'inchoate and unparticularized suspicion or "hunch." ' . . . The Fourth Amendment requires 'some minimal level of objective justification' for making the stop. . . . That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means 'a fair probability that contraband or evidence of a crime will be found,' . . . and the level of suspicion required for a *Terry* stop is obviously less demanding than for probable cause."

Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. *Adams v. Williams* . . . demonstrates as much. We there assumed that the unverified tip from the known informant might not have been reliable enough to establish probable cause, but nevertheless found it sufficiently reliable to justify a *Terry* stop. [Citation omitted.] Reasonable suspicion, like probable cause, is dependent upon both the content of information possessed by police and its degree of reliability. Both factors—quantity and quality—are considered in the "totality of the circumstances—the whole picture," *United States v. Cortez* [citation omitted], that must be taken into account when evaluating whether there is

> reasonable suspicion. Thus, if a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable. . . . [W]e conclude that when the officers stopped respondent, the anonymous tip had been sufficiently corroborated to furnish reasonable suspicion that respondent was engaged in criminal activity and that the investigative stop therefore did not violate the Fourth Amendment.

496 U.S. at 329-31.

This court recently examined use of a reliable informant's tip as the basis for an investigatory stop in *State v. Patterson*, 237 Neb. 198, 465 N.W.2d 743 (1991). In *Patterson* an informant with a history of supplying reliable information to police told the officers that he had seen Patterson with cocaine in a Ford Escort within the past 24 hours. After verifying that the address of Patterson's residence, his telephone number, and the registration for the Escort coincided with the information from the informant, police set up a surveillance of Patterson's house. When Patterson came out of the house and started to drive away in his Escort, police attempted to stop Patterson, who continued driving a few blocks before stopping. Officers approached Patterson's car and arrested him for possession of marijuana. At the police station, cocaine was found in Patterson's underwear. Patterson claimed that the cocaine was obtained by an unreasonable search, but this court found that the search of Patterson was reasonable, and stated:

> In *Terry v. Ohio* [citation omitted], the U.S. Supreme Court held that when a police officer suspects that criminal activity may be afoot, he may approach a person for purposes of investigating criminal behavior even though there is no probable cause to make an arrest. Nebraska has adopted this standard for investigatory stops. [Citations omitted.] . . .
>
> . . . .
>
> In Patterson's case, it is not necessary that we decide the issue of whether the informant's information was sufficient to provide probable cause for a warrant, since Patterson was legally stopped and arrested under the lesser

*Terry* standard. . . .

. . . .

When looking at the totality of the information provided by the informant, together with corroboration of this information by police, the officers had sufficient reasonable suspicion under *Terry* to stop Patterson after he left his home that evening, in order to investigate possible drug activity. . . . When Patterson failed to pull over as instructed by the officers, but instead fled from the scene, probable cause to believe Patterson was engaged in illegal drug activity arose, and the police were entitled to place him under arrest. The search of Patterson's person, whereby the cocaine was discovered in his underwear, was reasonable under the fourth amendment as a search incident to arrest.

237 Neb. at 204-06, 465 N.W.2d at 748-49.

Coursing through the preceding decisions is the proposition that a reliable informant's tip to police concerning criminal activity may furnish a basis for reasonable suspicion supporting a *Terry* stop.

As the U.S. Supreme Court, examining whether the police had sufficient facts to support an investigatory stop, stated in *Reid v. Georgia*, 448 U.S. 438, 441, 100 S. Ct. 2752, 65 L. Ed. 2d 890 (1980), "[T]here could, of course, be circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." Consequently, proper focus of an inquiry is not whether specific conduct is criminal or noncriminal, but whether a police officer's suspicion is reasonably related to the activity observed, criminal or noncriminal. In *State v. Ebberson*, 209 Neb. 41, 44-45, 305 N.W.2d 904, 907 (1981), this court stated:

Police officers must have a particularized and objective basis for suspecting the person stopped of criminal activity. The assessment of the totality of circumstances includes all of the objective observations and considerations, as well as the suspicion drawn by a trained and experienced police officer by inference and deduction that the individual stopped is or has been or is about to be engaged in criminal behavior.

See, also, *State v. Davis*, 231 Neb. 878, 438 N.W.2d 772 (1989); *State v. Thomte*, 226 Neb. 659, 413 N.W.2d 916 (1987).

Thus, in Thomas' case, police had a tip from a reliable informant, not an anonymous tipster, concerning drug activity involving a specific Cadillac automobile; observed operation of the Cadillac in an area of known drug traffic; and, therefore, had a foundation for a reasonable suspicion that the car carrying Thomas was the mobile cocaine dispensary reported by the reliable informant. For that reason, stopping the car was constitutionally justified under *Terry*.

Next, Thomas contends that his detention was outside the "stop and frisk" authorized by *Terry*. Although we have concluded that the officers' stopping the car was justified under *Terry*, events after the stop brought a different standard into the picture, namely, probable cause for arrest without a warrant. "When a law enforcement officer has knowledge, based on information reasonably trustworthy under the circumstances, which justifies a prudent belief that a suspect is committing or has committed a crime, the officer has probable cause to arrest without a warrant." *State v. Blakely*, 227 Neb. 816, 821, 420 N.W.2d 300, 304 (1988). Accord, *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992); *State v. Twohig*, 238 Neb. 92, 469 N.W.2d 344 (1991); *State v. Staten*, 238 Neb. 13, 469 N.W.2d 112 (1991).

After the police ordered the Cadillac's occupants to keep their hands visible as the officers approached the car, one of the occupants, Ross, took something from his pocket, placed it in his mouth, and attempted to swallow it. According to Sundermeier, "It appeared to me to be crack cocaine." In *Sibron v. New York*, 392 U.S. 40, 66-67, 88 S. Ct. 1889, 20 L. Ed. 2d 917 (1968), the Court said,

> [D]eliberately furtive actions . . . at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest.

The furtive activity within the Cadillac immediately after the stop, combined with the officers' experience and information,

furnished sufficient grounds for probable cause to believe that Thomas was engaged in illegal drug activity. Consequently, the police lawfully arrested him without a warrant.

[I]f there is a lawful arrest, police have authority, without a search warrant, to conduct a full search of the person arrested and . . . such search is reasonable under the fourth amendment to the U.S. Constitution. Further, a police officer's search is not limited to searching the arrested person for weapons only; the officer may search for and seize any evidence on the arrestee's person, even if such evidence is unrelated to the crime for which the arrest was made, in order to prevent concealment or destruction of evidence.

*State v. Staten*, 238 Neb. at 21, 469 N.W.2d at 118. Accord, *State v. Twohig, supra.* See, also, *United States v. Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969).

Since there was a *Terry* stop, a subsequent lawful arrest of Thomas, and a search incident to Thomas' arrest, the cocaine evidence obtained by officers at the time of Thomas' arrest was constitutionally admissible. Therefore, Thomas' first assignment of error is without merit.

### THE SEARCH OF 2515 HIMEBAUGH

In his second assignment of error, Thomas contends that police conducted an exploratory or general search of 2515 Himebaugh Avenue.

The factual content of Officer Sundermeier's search warrant affidavit was previously expressed in this opinion; therefore, restating all the facts presented through the affidavit is unnecessary. Suffice it to say, the information presented in Sundermeier's affidavit supplied the probable cause necessary for issuance of the search warrant.

"A general search for evidence of any crime is prohibited by the fourth amendment to the U.S. Constitution and article I, § 7, of the Constitution of Nebraska, both of which provide that probable cause be shown before the search may occur." *State v. Vrtiska*, 225 Neb. 454, 464, 406 N.W.2d 114, 122

(1987). Accord *State v. Traxler*, 210 Neb. 435, 315 N.W.2d 440 (1982).

" 'The search [must] be one directed in good faith toward the objects specified in the warrant or for other means and instrumentalities by which the crime charged had been committed. It must not be a general exploratory search through which the officers merely hope to discover evidence of wrongdoing.' "

*State v. Vrtiska*, 225 Neb. at 464, 406 N.W.2d at 122 (quoting from *State v. Waits*, 185 Neb. 780, 178 N.W.2d 774 (1970)). Accord *State v. Traxler, supra.*

However, when officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, the officers may seize such articles whether those items are initially in plain sight or come into plain sight subsequently as a result of the officers' efforts.

*State v. Vrtiska*, 225 Neb. at 464, 406 N.W.2d at 122.

All the physical evidence obtained at 2515 Himebaugh Avenue was seized while the officers were acting within the scope of the search authorized by the warrant and was not discovered after cessation of an authorized search. Thus, physical evidence at 2515 Himebaugh Avenue was not seized through a general exploratory search, but was obtained as the result of a lawful search warrant. Thomas' second assignment of error is without merit.

### RELEVANCY OBJECTION AND SUFFICIENCY OF OBJECTION

*Relevancy.*

At trial, Thomas objected to introduction of a police inventory sheet which listed items seized pursuant to the search warrant previously mentioned. The inventory sheet reflects 17 items, including Thomas' 2 firearms, $1,400 in food stamps, jewelry, and various documents which tend to show Thomas' residence as 2515 Himebaugh Avenue.

Thomas attacks admission of the inventory on the ground that it is irrelevant, i.e., "[e]vidence which is not relevant is not

admissible." Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1989). "Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1989).

"There are two components to relevant evidence: materiality and probative value. Materiality looks to the relation between the propositions for which the evidence is offered and the issues in the case. If the evidence is offered to help prove a proposition which is not a matter in issue, the evidence is immaterial. What is 'in issue,' that is, within the range of the litigated controversy, is determined mainly by the pleadings, read in the light of the rules of pleading and controlled by the substantive law. . . .

"The second aspect of relevance is probative value, the tendency of evidence to establish the proposition that it is offered to prove. . . ."

State v. Baltimore, 236 Neb. 736, 740, 463 N.W.2d 808, 812 (1990) (quoting McCormick on Evidence § 185 (Edward W. Cleary 3d ed. 1984)). Accord State v. Messersmith, 238 Neb. 924, 473 N.W.2d 83 (1991). "To be relevant, evidence must be rationally related to an issue by a likelihood, not a mere possibility, of proving or disproving an issue to be decided." State v. Lonnecker, 237 Neb. 207, 210, 465 N.W.2d 737, 740-41 (1991). Accord, State v. Coleman, 239 Neb. 800, 478 N.W.2d 349 (1992); State v. Baltimore, supra.

The main issue in Thomas' case was whether he intended to distribute the cocaine found on his person. Documentary evidence containing information that Thomas' residence was 2515 Himebaugh Avenue tended to establish that Thomas lived at that address and, therefore, was afforded access to the Kent Cadillac used to transport individuals dealing in drugs, according to the information supplied by the reliable informant. Also, recently, in State v. Groves, 239 Neb. 660, 477 N.W.2d 789 (1991), this court concluded that a defendant's possession of a firearm is relevant to a prosecution on the charge that the defendant intended to distribute narcotics possessed by the defendant. Therefore, evidence of Thomas'

two firearms, found at his residence, was relevant in the case against Thomas. However, we do not see how the presence of jewelry and food stamps relates to, or tends to prove, essential elements of the charge against Thomas. First, in view of the record presented, jewelry and food stamps were not contraband referable to or related with possession of cocaine, and, hence, evidence concerning those items was immaterial in prosecuting the possession charge against Thomas. Second, we find nothing in the mere presence of jewelry and food stamps that makes it more likely that Thomas intended to distribute cocaine, especially since Thomas was not the sole occupant of 2515 Himebaugh Avenue. Consequently, with the exception of reference to Thomas' firearms and documents which tended to show Thomas' residence, the inventory sheet was irrelevant and should have been excluded.

> [I]n a bench trial of a law action, including a criminal case tried without a jury, erroneous admission of evidence is not reversible error if other relevant evidence, admitted without objection or properly admitted over objection, sustains the trial court's factual findings necessary for the judgment or decision reviewed; therefore, an appellant must show that the trial court actually made a factual determination, or otherwise resolved a factual issue or question, through use of erroneously admitted evidence in a case tried without a jury.

*State v. Lomack*, 239 Neb. 368, 370, 476 N.W.2d 237, 239 (1991).

Thomas has failed to show that the district court actually made a factual determination, or otherwise resolved a factual issue or question, through use of those parts of the inventory sheet or list which were erroneously received in evidence. Most assuredly, the inadmissible parts of the inventory sheet were not the only evidence against Thomas. The other evidence against Thomas, admitted without objection or properly admitted over objection, is discussed in the next section. However, before proceeding, we note the proposition expressed in the State's brief: "The admission or exclusion of evidence is a matter within the discretion of the trial court." Brief for appellee at 31. We again direct attention to *State v. Messersmith*, 238 Neb. at

936, 473 N.W.2d at 92, wherein we expressly disapproved of the expression " 'The admission or exclusion of evidence is a matter within the discretion of the trial court.' "

Thomas' third assignment of error, based on his relevancy objection, has no merit.

*Sufficiency of Evidence.*

Finally, Thomas contends that the evidence adduced at trial is insufficient to show his "intent" to deliver crack cocaine.

"[C]ircumstantial evidence may support a finding that a defendant intended to distribute, deliver, or dispense a controlled substance in the defendant's possession." *State v. Zitterkopf*, 236 Neb. 743, 748, 463 N.W.2d 616, 620 (1990). Accord *State v. Messersmith, supra.*

> "Circumstantial evidence to establish that possession of a controlled substance was with intent to distribute or deliver may consist of the quantity of the substance, the equipment and supplies found with it; the place it was found; the manner of packaging; and the testimony of witnesses experienced and knowledgeable in the field."

*State v. Oldfield*, 236 Neb. 433, 445, 461 N.W.2d 554, 562 (1990) (quoting from *State v. Turner*, 192 Neb. 397, 222 N.W.2d 105 (1974)). See, also, *State v. Lonnecker*, 237 Neb. 207, 465 N.W.2d 737 (1991); *State v. Harney*, 237 Neb. 512, 466 N.W.2d 540 (1991); *State v. Messersmith, supra.*

Thomas admitted that he was in possession of crack cocaine, but denied that he was trafficking in the drug. Thomas' intent to sell the cocaine may be inferred from the circumstantial evidence, especially Sergeant Langan's stipulated testimony. Therefore, Thomas' fourth and last assignment of error lacks merit.

## CONCLUSION

Since Thomas' assignments of error are without merit, we affirm Thomas' conviction.

AFFIRMED.

BOSLAUGH, J., concurs in the result.